COMMONWEALTH vs. JIMS BENECHE.

Suffolk. May 7, 2010. - September 20, 2010.

Present: MARSHALL, C.J., COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Homicide. Joint Enterprise. Evidence,* Joint venturer, Admissions and confessions, Prior misconduct. *Constitutional Law,* Admissions and confessions. *Jury and Jurors. Practice, Criminal,* Capital case, Admissions and confessions, Instructions to jury, Jury and jurors, Voir dire, Assistance of counsel.

At the trial of indictments charging the defendant with murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty, the evidence was sufficient to permit the jury to find the defendant guilty as a joint venturer, where the forensic evidence supported a reasonable inference that the defendant was at the scene of the murders (his apartment in the middle of the night) and participated in the murders; where the injuries sustained by the victims and the way in which the victims died supported a reasonable inference that two people perpetrated the killings; where the evidence demonstrated that the defendant had the requisite intent; and where the defendant exhibited consciousness of guilt. [69-72]

At a murder trial, the admission of testimony that, after being arrested and read Miranda rights, the defendant remained silent, expressed his desire not to talk about the death of one of the victims (his son), and did not display any emotion, although violative of the defendant's right to remain silent, did not cause a substantial likelihood of a miscarriage of justice, where the testimony (which was admitted in the course of a long trial) was brief and was not dwelled on in summation; where it was cumulative of other, properly admitted evidence; and where the evidence of the defendant's guilt was overwhelming. [72-76]

At the trial of indictments charging the defendant with murder in the first degree as a joint venturer on theories of deliberate premeditation and extreme atrocity or cruelty, the judge did not err in instructing the jury that the defendant's coventurer had been convicted at a separate trial being conducted simultaneously in the same court house, where the defendant recommended that this information be presented to the jury in the form of an instruction, and where the instruction was consistent with the theory of the defense. [76-77]

There was no merit to the criminal defendant's claim that, at a murder trial, the judge, in instructing the jury on joint venture, removed the Commonwealth's burden to prove that the defendant was present at the scene of the crime. [77]

At a criminal trial, the judge did not abuse his discretion in declining to conduct a voir dire of a juror who defense counsel tentatively identified as

possibly sleeping during testimony, where the judge responded immediately to defense counsel's concerns, closely watched the juror, and monitored the situation. [77-79]

At a murder trial, counsel was not ineffective for failing to object to the admission of prior bad act evidence, where the evidence was properly admitted to show the hostile relationship between the defendant and one of the victims that contributed to the defendant's motive for the murders. [79-81]

This court declined to exercise its power under G. L. c. 278, § 33E, to reverse verdicts of murder in the first degree and order a new trial, or to reduce the verdicts to a lesser degree of guilt. [81-82]

INDICTMENTS found and returned in the Superior Court Department on August 20, 2004.

The cases were tried before *Patrick F. Brady*, J.

*Greg T. Schubert* for the defendant.

*Anna E. Kalluri*, Assistant District Attorney (*Patrick M. Haggan*, Assistant District Attorney, with her) for the Commonwealth.

CORDY, J. On May 23, 2004, the police found the body of Kayla Ravenell in the Great Pond Reservoir in Braintree. The body of her two year old son was found the following morning; he had been suffocated to death, put in a trash bag, and then thrown out a window. The defendant, Jims Beneche, who was Ravenell's former boy friend and the father of the two year old, was indicted for the murders, as was his then current girl friend, Jessica Deane. Beneche was tried separately, and a Superior Court jury found him guilty as a joint venturer of murder in the first degree on both indictments, on theories of deliberate premeditation and extreme atrocity or cruelty.[1]

On appeal Beneche argues that (1) the evidence was insufficient to support the verdicts; (2) his right to silence was violated by the admission of testimony that, inter alia, he was unresponsive to police allegations that he threw his son out the window; (3) the trial judge erred in instructing the jury that Deane had been convicted of the two murders; (4) the judge erroneously instructed the jury that the defendant was present at the scene of the crime; (5) the judge erred in failing to conduct a voir dire to determine

---

[1]Jessica Deane was also found guilty of the murders of Kayla Ravenell and her child. We upheld those convictions on appeal. *Commonwealth* v. *Deane*, *ante* 43 (2010).

whether one of the jurors had been sleeping during the trial; and (6) his counsel was ineffective for, among other things, failing to object to evidence of Beneche's "prior bad acts." Beneche additionally requests that we reverse the murder convictions and grant him a new trial or reduce the verdicts based on our authority bestowed by G. L. c. 278, § 33E. For the reasons set out below, we affirm both convictions of murder in the first degree and discern no basis to exercise our powers under that statute.

1. *Background.* We summarize the evidence as the jury could have found it, focusing on the facts relevant to the defendant's challenge to the sufficiency of the evidence, and reserving certain facts for later discussion.

a. *History of defendant's relationships with Ravenell and Deane.* Beneche and Ravenell began dating while in high school during the fall of 1999. Their relationship continued for several years and on February 22, 2002, the couple's child was born. Although Beneche and Ravenell remained together after the child was born, and he took responsibility for being the child's father, the relationship soon began to deteriorate and ended during the summer of 2002. Later that year, Beneche began dating Deane.

Approximately one year after Deane and Beneche began dating, Deane moved into the apartment at 824B Border Street in the Shore Plaza apartment complex in the East Boston section of Boston that Beneche shared with his mother and brother. According to close friends, Beneche and Deane loved each other, were "very happy together," were together every day, and exhibited many personal displays of affection. Deane wrote several love letters to Beneche, which he kept in his top dresser drawer, expressing, "I will prove my love to you. You're my everything . . . I'm willing to die for you. I would do anything for you, no matter what it was. I'd kill someone for you. I would still do it just because you asked me to." The couple planned to move into their own apartment, and they told friends that they were married.

As Beneche's relationship with Deane grew more serious, his relationship with Ravenell became more tumultuous. Although electronic mail messages (e-mails) between him and Ravenell suggest that the two were still close, their relationship also

turned hostile and became a source of problems in Beneche's life. In January, 2003, a judge ordered Beneche to pay child support in the amount of fifty-seven dollars per week. Because he failed to do so, his wages were garnished and funds were deducted from his income tax refunds. While he was out of work he received multiple letters from the Department of Revenue informing him that he was in arrears and assessing penalties. At the time of the killings, Beneche owed Ravenell over $3,000 in child support. As one neighbor and friend testified, Beneche expressed his anger that Ravenell "nagged him all the time" about the child and that he was "sick" of paying child support.

On July 20, 2003, Ravenell went to the East Boston police station with her child. She was crying and the right side of her face was swollen. Ravenell claimed that she had asked Beneche for money, and that he became angry and struck her. He then threw twelve dollars at her and called her a "bitch."[2] Beneche was subsequently arrested; the charges against him for this incident were ultimately dropped. Beneche complained to friends that Ravenell had him arrested.

On September 3, 2003, police officers responded to a "domestic violence" call at Ravenell's apartment at 3 Monadnock Street in the Dorchester section of Boston. Beneche and Ravenell had been arguing over money, and each claimed to have been hit by the other. Beneche was angered further by this and other incidents involving the police.

Additionally, Beneche's continued contact with Ravenell (when he visited his son at her apartment) caused him problems in his relationship with Deane. After Beneche returned from visiting his son, he often engaged in heated arguments with Deane, who wanted him to have nothing to do with Ravenell and his child. Deane was jealous of Ravenell and the child, and according to a friend, "wished them death." Deane frequently told her friends and others how much she hated Ravenell. She was upset that Beneche had a child with Ravenell because she wanted to have his first son. In an undated letter to a friend, which was found in Beneche's apartment after the murders,

---

[2]Ravenell's statements to the police concerning Beneche's actions on July 20, 2003, were admitted in evidence not for their truth, but to show the nature of his relationship with the victims.

Deane wrote, referring to Ravenell: "I'm doing that shit for that bitch, I'm plotting everything right now so there ain't no one gets caught up. The bitch is finally done for." Despite Deane's protestations, Beneche continued to visit his son and spent Easter with Ravenell's family. However, he became increasingly angry at Ravenell, often coming home from visits with his son so angry that he would punch a wall. He began questioning whether he was the child's father.

Deane also made numerous harassing and threatening telephone calls to Ravenell from Beneche's telephone. Beneche was aware of these calls and they were witnessed by several of their friends. In January, 2004, after Ravenell complained to the police that she had received threats from a female voice coming from Beneche's number and had heard his voice in the background, the police began an investigation. When questioned by the police, and later under oath at a clerk's hearing, Beneche denied that he had a girl friend and that a female had called from his telephone. Not only did he lie to protect Deane, but Beneche alleged that he was the "true victim" and filed for a protective order against Ravenell.

During the week before the murders, the conflict between Beneche and Ravenell intensified. Ravenell sent Beneche an e-mail on May 18, 2004, that in harsh terms and profanity criticized the defendant for giving her a sexually transmitted disease, and for being jobless, useless, and a bad father who owed child support. Among other things, she told him, "Do everyone a favor, jump in front of a bus or just kill yourself. You won't be miss[ed] over here." She threatened to contact his mother to expose his problems, and vowed to cut off contact with him. In response, Beneche sent Ravenell an e-mail the following day stating, "I guess this is the end of the road. It had to happen someday I guess. Well, goodbye forever, and I hope you have a good life." During the same week, Deane announced to her friends that she was pregnant with Beneche's child.

b. *The murders.* The victims were killed late in the evening of May 22 or early in the morning of May 23. Photographs from a security camera at 3 Monadnock Street showed Ravenell and her son leaving their apartment in pajamas at approximately 11 P.M. Ravenell drove her mother's 1996 Chevrolet Corsica

automobile, a vehicle she often borrowed, to Beneche's apartment in East Boston.[3] There, Ravenell was beaten and then suffocated to death. Among other injuries, the medical examiner testified that she suffered severe bruising in four distinct areas of her head, and that something was held over her nose and mouth for at minimum four minutes, causing her death. Ravenell's limbs where then tied together with strips ripped from a white sheet. Her body was placed in black plastic bags around which coaxial cable was wound.[4]

Ravenell and Beneche's child was also beaten; his skull was fractured. The bruise marks around his neck, nose, and mouth indicated that he was suffocated by one hand squeezing his neck while another compressed his nose and mouth for at least ninety seconds. The jury could have found that Beneche cut his fingers while beating the victims; his blood was later found on a large rock in the apartment and on Deane's boots, later recovered from the apartment.

Shortly after the murders, in the early morning hours of May 23, 2004, a neighbor of Beneche, who had gone outside to smoke a cigarette, saw Beneche and Deane leaving the building carrying a "big, very long trash bag." According to the neighbor's testimony, the bag "seemed to be very heavy," and one was pulling it as the other was kicking it down the back staircase. The pair placed the bag in the back of the Corsica in which Ravenell had arrived, and they drove to the Great Pond Reservoir in Braintree where they dumped the bag into the pond. It was discovered later that afternoon by an off-duty State trooper who was walking with his sons;[5] it contained Ravenell's body.

After leaving the reservoir, the defendant and Deane proceeded to the emergency room at a hospital in Brockton where Beneche was treated for the injury to his fingers. Photographs

---

[3]Beneche's mother and younger brother, who also lived in the apartment at 824B Border Street, were away that evening.

[4]The same type cable was later found in Beneche's apartment.

[5]To identify the body, the police released information to the news media. After the 11 P.M. broadcast, Ravenell's sister contacted the police and identified the body by describing several of Ravenell's tattoos. The police then went to Ravenell's apartment, which was neat and showed no signs of being the location of the murder. At that point, the child was still missing and the police sought to locate the boy.

from the hospital security camera showed the couple holding hands. At approximately 9 A.M., they left the hospital. They drove to a wooded area in Brockton, just a few minutes' walking distance from Deane's mother's home, where they abandoned the Corsica. The trunk was stained with Ravenell's blood, and the police recovered one latex glove on the floor near the front passenger seat. Deoxyribonucleic acid (DNA) testing revealed that blood on the exterior of the glove was Ravenell's and that blood on the interior of the glove was a mixture of Beneche's and Ravenell's.

Later in the afternoon of May 24, 2004, Beneche and Deane returned to his apartment in East Boston. Beneche's brother and a neighbor who saw Beneche after the killings did not notice anything different or unusual about his behavior. At approximately 3:45 P.M. Beneche sent an e-mail to Ravenell's e-mail address stating that he had been trying to contact her and was worried about the child's asthma.

Meanwhile, after finding the body at the reservoir, the police had begun investigating Ravenell's murder and were attempting to locate her child. The police arrived at Beneche's apartment at approximately 2 A.M. on May 24. Beneche's mother permitted Detective Donald Gosselin, Detective Mark Sherrick, and State Trooper Bruce Tobin to enter the apartment, and indicated that Beneche's bedroom was upstairs. Beneche and Deane were in the bedroom. When they heard the police, a trash bag containing the child's body was pushed out of the bedroom window near their bed, landing in a parking area below.[6] As the two detectives walked into the defendant's bedroom, the defendant and Deane pretended to be asleep.

c. *The defendant's statements to the police.* After entering the bedroom, the police separated Deane and Beneche for questioning. Detective Gosselin then received a call on his radio and ran out of the apartment. Trooper Tobin, who remained

---

[6]Officer Richard Casallas was positioned in the parking area directly underneath Beneche's apartment. After the other officers went up to Beneche's apartment, Officer Casallas heard "fluttering plastic" and turned to see the plastic trash bag hit the pavement, making a "loud thump noise." Officer Casallas approached the torn bag and saw two small feet in white socks. He opened the bag to find the child's body, which exhibited signs that he had been dead for some time, including rigor mortis in the fingers.

with Beneche, began questioning him regarding the whereabouts of Ravenell and his son.[7] According to Tobin's testimony, Beneche stated that he had not seen them in a week. During his exchange with Officer Tobin, Beneche's demeanor was calm and unemotional. Detective Gosselin, after returning to the apartment from having seen the child's body in the parking area, then arrested Beneche, read him the Miranda warnings, and arranged for him to be transported to the East Boston police station. The testimony of several officers about Beneche's behavior during and immediately after the arrest was admitted in evidence and is described in detail below where relevant.

At the station, after being read the Miranda warnings for a second time and signing a waiver form, Beneche made several inconsistent statements to the police regarding his involvement in the killings.[8] First, he said that he had cut his fingers during the early morning of Saturday, May 22, 2004, while preparing food for a "big feast" they were going to have later that day. He again informed the officers that he had not seen Ravenell or his son for a "couple of weeks" and denied any knowledge of their whereabouts.[9]

After further questioning, Beneche said that Ravenell had made threats to him, and that when Ravenell "didn't get her way, she would make it difficult on him and his family." He explained that Deane and Ravenell hated each other, and then, according to the officer, he "blurted out" that he "figured" this

---

[7]Miranda warnings were not given to Beneche as a prelude to this initial questioning. The judge properly found that the defendant was not in custody at this point, an issue not raised by the defendant on appeal.

[8]Beneche's statements were not recorded. The judge gave an appropriate instruction regarding unrecorded statements, as required by Commonwealth v. DiGiambattista, 442 Mass. 423, 447-448 (2004).

[9]The defendant also told the police officers that after having his fingers treated at a hospital in Brockton, he had gone home and slept "all day" Saturday and Sunday, and did not get up until he was awakened by the police early Monday morning. The defendant said that he and Deane took the train to the hospital, but could not remember which stops they used to get there. The hospital is not near a train stop. Just before the police arrived, he heard the window close and Deane was the only one in the room with him. He said that due to the injury on his hand, his blood would have been all over the apartment. When an officer questioned him about when it was that he attended the "large dinner," the defendant had a blank stare, as if he did not know what was being referenced, and then said that they did not have the dinner.

hatred was the reason Deane killed Ravenell and the child. After making this accusation, Beneche changed his story. He said that Ravenell had sent him an e-mail saying that she was going to come over on Saturday night (May 22, 2004) with the child, who would stay the night. Once she learned that Deane was staying at his apartment on Saturday night, Ravenell became upset. Beneche had asked Deane to leave, but when she refused, he left the apartment and "bopped around the neighborhood by himself." Beneche claimed that he went to a park and "sat on the park bench for a long, long time, all of Saturday night."

Beneche then gave differing accounts of what happened when he returned from the apartment from "wandering around the streets." First he told the officers that when he arrived at the apartment he saw Deane with bruises on her face, and that she admitted to killing Ravenell. When the officers asked where Ravenell's body was, he changed his story, and said that Deane was not at his apartment when he returned. After thinking again, Beneche returned to his previous statement, said that Deane was at the apartment when he arrived, that she admitted to stabbing Ravenell, and that Deane must have hidden the body in the apartment or called some friends to remove the body. Beneche assured the officers that he neither saw nor was in Ravenell's car.

According to the officer who was conducting the interrogation, Beneche remained "[u]nemotional," "[v]ery stoic," and "like ice" as he talked about the fact that Deane killed Ravenell and his two year old son. Beneche did not ask about how his son was killed, or where the body was located.

Beneche's defense at trial, articulated in both the opening statement and closing argument of his counsel, was that Deane committed the murders, and that he helped her dispose of the bodies because he believed he would be blamed for the crimes; that he was an accessory after the fact, but not a murderer. He did not testify. We now turn to the merits of his appeal.

2. *Sufficiency of the evidence.* At the close of the Commonwealth's case, defense counsel moved for required findings of not guilty, and renewed that motion at the close of all the evidence. Beneche challenges the denial of those motions on appeal, arguing, as at trial, that the evidence was insufficient to place him at the scene and demonstrate that he participated in

the murders, as opposed to being an accessory after the fact. He also challenges that the evidence was insufficient to demonstrate that he shared the intent to kill, which is required for premeditated murder. See *Commonwealth* v. *Zanetti*, 454 Mass. 449, 454, 467-468 (2009) (under theory of joint venture, "defendant is guilty if the Commonwealth has proved beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense"). In evaluating the defendant's claims, we employ the well-established test "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). We conclude that there was sufficient evidence to support the jury's verdicts.

There was no direct evidence that Beneche was an assailant, but "[c]ircumstantial evidence is competent to establish guilt beyond a reasonable doubt." The inferences drawn from it need only be "reasonable and possible," not necessary or "inescapable." *Commonwealth* v. *Bush*, 427 Mass. 26, 30 (1998), quoting *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977). The forensic evidence alone supports a reasonable inference that Beneche was at the scene — his apartment in the middle of the night — and participated in the murder. Beneche had cuts on his fingers that required medical treatment, and his blood along with Ravenell's was found in the apartment and on a latex glove in the Corsica. The injuries sustained by the victims and the way in which they died also supports a reasonable inference that two persons perpetrated the killings. Ravenell was hit from both sides of her head, sustaining injuries in at least four distinct areas. She was suffocated to death, and would have fiercely struggled for air, suggesting that someone stronger or two persons were involved in her killing. The child's death was attributed to two causes: head trauma and suffocation. The diverse injuries on the victims support an inference that multiple attackers were involved. See *Commonwealth* v. *Phillips*, 452 Mass. 617, 634 n.12 (2008) ("That more than one person inflicted the victim's

injuries could have been inferred based on the extensive and different injuries . . .''). Although none of the evidence establishes the precise conduct that Beneche, as opposed to Deane, perpetrated, as the jury were instructed, such evidence was not required to convict Beneche as a joint venturer. *Id.* at 634.

As to the element of intent, the jury could have found that Beneche persuaded Ravenell to bring his son to his apartment on the night of the murder, knowing that Deane would be there and intending to help kill them. The evidence presented regarding the relationship among Beneche, Ravenell, and Deane provided sufficient basis for establishing Beneche's shared motive with Deane to remove Ravenell and Beneche's son as an obstacle to their life together. Although the evidence of his desire to kill Ravenell may not have been as strong as the evidence of Deane's desire to do so, given that she wrote explicit letters and made threatening telephone calls, there was extensive evidence that the relationship between Beneche and Ravenell was increasingly hostile. Ravenell had caused him to be arrested, to be investigated by the police on multiple occasions, and to have to pay child support, and she was the source of many problems in his relationship with his new girl friend, who was having his child. The week before the murder, Beneche sent Ravenell an e-mail stating, "goodbye forever" — a reasonable inference is that he was "plotting" with Deane to kill Ravenell and his son. Moreover, the extent of the injuries and the fact that the victims were suffocated to death, a process that took (in Ravenell's case) at least four minutes, further demonstrates that Beneche had the requisite intent.

In addition, the Commonwealth presented evidence that Beneche exhibited consciousness of his guilt, by disposing of the bodies and other evidence of the crime,[10] lying to the police, and sending Ravenell an e-mail after he knew she was dead. Although Beneche argues that this evidence is consistent with his participation as an accessory after the fact who was afraid he would be blamed for the murders, the jury could have found

---

[10]The police investigation did not recover a murder weapon. The police only found one latex glove; the jury could have reasonably believed that Beneche threw away the other glove and other evidence.

otherwise. After the murders, Beneche and Deane were seen holding hands, and witnesses testified that they did not notice anything unusual in his behavior. During the course of giving statements to the police, Beneche did not ask how his son was killed and did not display any sadness when discussing his death. The jury could have found that such behavior was inconsistent with someone who unwillingly participated in helping Deane clean up the crime scene, but instead reflected consciousness of guilt for willing participation in the murder. Viewed in its entirety, the evidence of Beneche's guilt was overwhelming.

3. *Right to silence.* During the direct examination of several police officers, the Commonwealth elicited testimony that after being arrested and read the Miranda warnings Beneche remained silent, expressed his desire not to talk about his son's death, and did not display any emotion. Beneche argues that such testimony constituted a violation of his right to remain silent. See *Doyle* v. *Ohio,* 426 U.S. 610, 617-618 (1976); *Commonwealth* v. *Peixoto,* 430 Mass. 654, 658-659 (2000). We agree, but find that such testimony, which was not objected to at trial, did not cause a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Grenier,* 415 Mass. 680, 690-691 (1993). We begin by describing the testimony that Beneche challenges.

After the police officers entered Beneche's apartment in the early hours of May 24, 2004, Detective Gosselin received a radio call, left the apartment, and then was alerted that the child's body had been thrown out the window. Detective Gosselin then returned to the apartment, and, after using some admittedly unprofessional profanities, said to Beneche, "You threw your son out the window. You're under arrest."[11] He proceeded to place Beneche in handcuffs and read him the Miranda warnings. At trial, Detective Gosselin testified that in response to his accusation Beneche did not say anything and had "no emotion or reaction at all," and did not ask about the condition of his child. Similarly, Trooper Tobin testified that Beneche was "unemotional," "stone cold," and did

---

[11]The jury were instructed that Detective Gosselin's statement that Beneche threw the child out the window should not be considered as proof of the fact asserted. The judge allowed the statement to demonstrate Beneche's demeanor and reaction to the accusation.

not say a word or ask about the condition of his son as Detective Gosselin was arresting him.

Detective Gosselin walked Beneche down the stairs from his apartment and toward a cruiser. They passed about fifteen feet from the child's body, such that they could see the "little foot sticking out of the bag." Detective Gosselin asked Beneche, "How could you throw your son out the window?" According to Detective Gosselin's testimony, Beneche responded, "I don't want to talk about it." Beneche was then pat frisked and transported to the police station in East Boston. Both of the officers who transported him testified that while en route, Beneche remained emotionless and did not ask about his child. Beneche argues that it was a violation of his right to remain silent for the Commonwealth to introduce testimony that while being arrested and transported to the police station, he (1) remained silent and did not ask any questions; (2) stated that, "I don't want to talk about it"; and (3) was unemotional.[12]

"There is no question that, under the fundamental principles of jurisprudence, evidence of a criminal defendant's postarrest, post-Miranda silence cannot be used for the substantive purpose of permitting an inference of guilt." *Commonwealth* v. *Mahdi*, 388 Mass. 679, 694 (1983), and cases cited. Testimony regarding a defendant's statements indicating his or her intention to remain silent are "equally unacceptable." *Id.* at 694-695, citing *Commonwealth* v. *Cobb*, 374 Mass. 514, 518 (1978). Miranda warnings contain an "implicit assurance that a defendant's silence after such warnings will carry no penalty," and due process requires that, when in the hands of the police, a defendant must be able to "invoke core constitutional rights without fear of making implied or adoptive admissions." *Commonwealth* v. *Peixoto*, *supra* at 657, 658-659. Here, the officers' testimony that Beneche remained silent, did not ask any questions, and asserted that he did not want to talk about the accusations violated these principles.[13]

---

[12]Beneche does not challenge (and we see no error in the admission of) Trooper Tobin's testimony as to his conversation with Beneche before he was arrested or the testimony regarding Beneche's statements to the officers and demeanor while at the police station after he waived his Miranda rights and agreed to speak to the police.

[13]To the extent that any of the officers' testimony that is being challenged

Further, the officer's testimony as to Beneche's demeanor as he exercised his right to silence was improperly admitted as evidence of consciousness of guilt. Beneche's demeanor, particularly his lack of emotion, was an element of the fact that he did not respond to police accusations, and in the circumstances presented here is intertwined with his right to remain silent. See *Commonwealth* v. *Thompson*, 431 Mass. 108, 117, cert. denied, 531 U.S. 864 (2000) (testimony regarding defendant's "action of staring at the floor should not have been admitted for purposes of proving consciousness of guilt"); *Commonwealth* v. *Harris*, 371 Mass. 462, 476-477 (1976) (defendant's "hanging his head" and "biting his lips" part of "failure to respond" to police questioning after arrest and not admissible as "nontestimonial admissions demonstrating a consciousness of guilt").

The Commonwealth contends that Beneche did not exercise his right to remain silent because he spoke with Trooper Tobin before he was arrested, complained to an officer about being pat frisked,[14] and then gave a statement to the police at the station. This argument is unpersuasive. Beneche spoke with Trooper Tobin before receiving the Miranda warnings and knowing he was under arrest, and he maintained the right to terminate the interview, even if he had previously spoken with an officer. See

on appeal referred to pre-Miranda silence, it is similarly inadmissible. It is unclear from the trial transcript whether Detective Gosselin and Trooper Tobin testified that Beneche was silent before or after Detective Gosselin read the Miranda warnings. While the admission of a defendant's prearrest silence may not violate the due process principles of the United States Constitution, see *Jenkins* v. *Anderson*, 447 U.S. 231, 238-239 (1980), we have held that testimony related to the defendant's silence in response to police questioning even before Miranda warnings are given may be inadmissible. *Commonwealth* v. *Thompson*, 431 Mass. 108, 117, cert. denied, 531 U.S. 864 (2000). "Although most lay people do not know the intricacies of their constitutional rights, it is a generally held notion that one does not have to say anything to the police and that what one does say may be used against [one]." *Id.*, quoting *Commonwealth* v. *Nickerson*, 386 Mass. 54, 61 (1982). Beneche had the right to remain silent in the face of Officer Gosselin's accusation even before receiving his Miranda rights, and admission of such silence as evidence of guilt infringes on that right. Compare *Commonwealth* v. *Womack*, 457 Mass. 268, 276-278 (2010) (after defendant waived his Miranda rights and agreed to speak to police, silence in response to specific questions admissible).

[14]While being pat frisked before being placed in the cruiser, Beneche said to the officer (whom he addressed with an expletive), "Don't you see I just have boxers on, why are you searching me?"

*Commonwealth* v. *Grenier*, 415 Mass. 680, 690 (1993) ("There is no implication of guilt to be found simply because a person, who had received Miranda warnings, decided that he wanted to terminate a police interview"). The fact that Beneche decided to speak with police after being transported to the station and receiving a second set of Miranda warnings does not mean that he forfeited his right to silence earlier. Contrary to the Commonwealth's argument, the testimony Beneche challenges (he does not challenge testimony regarding his statement at the police station) is distinguishable from testimony we have found admissible when the defendant has given a "far-ranging statement over several hours" and failed to answer some particular question or to "ask appropriate questions that an innocent party would ordinarily ask." *Commonwealth* v. *Thompson, supra* at 118.

The Commonwealth further argues that Beneche's statement, "I don't want to talk about it," was not a sufficient invocation of his right to silence, and is therefore admissible. For support, the Commonwealth relies on several decisions where we considered whether a defendant's statement regarding his desire to remain silent was legally sufficient to trigger the police officer's obligation to terminate questioning as required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966). See, e.g., *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 265 (1982). These cases are not dispositive of the issue here. See *Commonwealth* v. *Peixoto*, 430 Mass. 654, 658 (2000). Even if legally insufficient to stop police questioning, testimony regarding a defendant's statements about his desire not to speak with police may suggest to the jury that the defendant is guilty simply because he chose to exercise his constitutional right to silence, and accordingly we have held it inadmissible. See *id.* at 659 (due process protections of Massachusetts Constitution permit defendant to "inquire about his rights to remain silent and to have counsel, to think out loud about these rights, and to engage them, even tentatively" without testimony regarding such comments being admitted at trial).[15]

Although this testimony should not have reached the jury,

---

[15]The Commonwealth also argues that the defendant did not object to the testimony as a strategic trial tactic and that we should therefore not entertain his argument that such testimony was admitted in error. See *Commonwealth* v. *Kirwan*, 448 Mass. 304, 315, 319 (2007). We see little basis for a strategic decision to allow such testimony, but need not reach this issue because, as

and the prosecutor should not have mentioned it in the closing argument, defense counsel did not object to it at trial. The testimony was brief, was admitted in the course of a long trial, and was not dwelled on during summation. *Commonwealth* v. *Thompson, supra* at 117, quoting *Commonwealth* v. *Grenier, supra* at 690. Moreover, it was cumulative of other, similar evidence, including properly admitted testimony that Beneche was unemotional and did not ask about his child while being interviewed by the police at the station and when questioned by Trooper Tobin before his arrest. Photographs from the hospital surveillance camera and the testimony of Beneche's friends indicated that his behavior after the murders was unremarkable. In addition, as we have explained, the evidence of Beneche's guilt was overwhelming. For these reasons, we conclude that the testimony challenged on appeal did not cause a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Grenier, supra* at 690-691.

4. *Instruction as to the verdicts against Deane.* Deane, who was tried separately, was convicted of the two charges of murder of Ravenell and her son. The verdicts in Deane's trial were returned during the fourth day of Beneche's trial, by a jury deliberating in the same court house. Given the publicity surrounding the Deane trial and the likelihood that the jury in Beneche's case would hear about Deane's convictions, the judge asked counsel what if anything they would suggest he should do either to better ensure the jury were not exposed to the news about it or to neutralize the likelihood of exposure with some form of stipulated instructions. Later in the day, the Commonwealth and defense counsel jointly recommended that the judge instruct the jury that Deane had been convicted. The judge did so, in accord with language proposed by counsel, cautioning the jurors that the verdicts in Deane's case were "of no evidentiary significance" in Beneche's trial and that it would be "wrong" to take it into account when considering whether Beneche was responsible for the killings.

Beneche now challenges the judge's instruction on appeal. He argues that because he was prosecuted on a theory of joint venture with Deane, informing the jury that Deane had been

explained *infra*, we conclude that this error did not cause a substantial likelihood of a miscarriage of justice.

convicted was prejudicial erroneous information that caused a substantial likelihood of a miscarriage of justice. A defendant has a right to a verdict based solely on the evidence presented in his case, *Turner* v. *Louisiana*, 379 U.S. 466, 472-473 (1965), and juror access to potentially prejudicial information not in evidence may in many cases suffice to invalidate the verdict, see *Commonwealth* v. *Hunt*, 392 Mass. 28, 40 (1984). However, in this case, the defendant recommended that this information be presented to the jury in the form of an instruction from the judge. This stipulation was consistent with — and may have even bolstered — the defense's theory that Deane was solely responsible for the killings.[16] In closing arguments, defense counsel relied on this stipulation, arguing to the jury: "We know [Deane]'s involved in this. She's been convicted. So the overwhelming evidence is that she killed the baby."[17] In the unusual circumstances of this case, the judge's instruction, which should not ordinarily be given, was not in error.

5. *Instruction as to the defendant's presence at the scene.* Beneche's challenge to the judge's instruction on joint venture is also without merit. He claims that the judge removed the Commonwealth's burden to prove that he was present at the scene of the crime, see *Commonwealth* v. *Green*, 420 Mass. 771, 779 (1995), by instructing: "It has been proved that the defendant was present at the scene . . . ." This claim rests on a typographical error in the transcript. As the tape recording of the jury charge reflects, the judge instructed the jury: "*If* it has been proved that the defendant was present at the scene . . . ." (emphasis added). The court reporter has modified the transcript accordingly.

6. *Inquiry as to whether there was a sleeping juror.* The trial transcript reflects that on two occasions defense counsel inquired as to whether one of the jurors was sleeping during witness

---

[16]On the record before us, the decision of defense counsel appears strategic and, in the circumstances, not manifestly unreasonable, especially given the strength of the Commonwealth's case and the nature of the defense.

[17]The Commonwealth also relied on this stipulation during its summation, arguing to the jury, "[Deane] is a killer. Like [defense counsel] said, she has been convicted. But she was a joint venturer. The decision for all of you to focus on, the facts for all of you to focus on, is what the defendant, Jims Beneche, did."

testimony. Because the judge did not conduct a voir dire to determine whether this juror had been sleeping, Beneche argues that his right to a fair trial was jeopardized, requiring reversal and a new trial even absent a showing of prejudice. See *Commonwealth* v. *Keaton*, 36 Mass. App. Ct. 81, 87 (1994). "A judicial observation that a juror is asleep, or a judge's receipt of reliable information to that effect, requires prompt judicial intervention to protect the rights of the defendant and the rights of the public, which for intrinsic and instrumental reasons also has a right to decisions made by alert and attentive jurors." *Commonwealth* v. *Dancy*, 75 Mass. App. Ct. 175, 181 (2009). The judge has "discretion regarding the nature of the intervention," *id.*, and not every complaint regarding juror attentiveness requires a voir dire, see *Commonwealth* v. *Braun*, 74 Mass. App. Ct. 904, 905 (2009). The burden is on the defendant to show that the judge's decision in the matter was "arbitrary or unreasonable." *Commonwealth* v. *Brown*, 364 Mass. 471, 476 (1973). We conclude that there was no such abuse of discretion here.

During the first day of testimony, defense counsel informed the judge during a bench conference, "There's one juror there that seems to be sleeping." He then qualified his observation, suggesting, "Maybe he's taking notes." The prosecutor confirmed, "Right now he's taking notes. It looks like he's sleeping, but he's taking notes." The judge thanked defense counsel for alerting him to the issue and assured him that he would "keep a careful eye" on the specified juror. At the next sidebar, defense counsel raised the issue again, stating that "it seemed like he was maybe nodding." The judge believed the juror "had his eyes open," and again assured defense counsel that he would keep watching him to "make sure that he stays awake." The judge stated, "I'll have the [court] officer speak to him if he seems to be nodding off." Defense counsel did not request a voir dire and the trial continued without this issue being raised again.

As these two exchanges demonstrate, the judge did not observe the juror sleeping, did not believe that he was "nodding off," and did not have "reliable information" to the contrary. *Commonwealth* v. *Dancy*, *supra*. Defense counsel was not even certain that the juror had been sleeping. The judge responded

immediately to counsel's concerns, closely watched the juror, and monitored the situation. Given the tentativeness of the information that the juror was sleeping, the judge's decision was reasonable.

7. *Ineffective assistance of counsel and prior bad acts.* Lastly, Beneche contends that his trial counsel was ineffective for failing to object to "prior bad act" evidence, including testimony that the defendant hit Ravenell on July 20, 2003. He further argues that he was denied effective assistance of counsel because his attorney failed to object to violations of his right to silence, failed to object to the jury instructions that he now challenges on appeal, and failed to request that the judge conduct a voir dire as to whether a juror was sleeping. As we have previously addressed these latter issues, finding that none of them merits reversal, we now turn to the argument of ineffective assistance of counsel with respect to prior bad act evidence.

For claims of ineffective assistance of counsel in capital cases, we review "pursuant to G. L. c. 278, § 33E, a standard of review that is even more favorable to the defendant" than that set forth in *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 517 (1992). We do "not focus on the adequacy of trial counsel's performance," but instead consider whether there was an error in the course of the trial, and if there was, whether that error "was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). We conclude that there was no error in the admission of the evidence, and therefore no ineffectiveness of counsel.[18]

At trial, the Commonwealth presented evidence of three "prior bad acts" that Beneche challenges on appeal. First, an officer who spoke with Ravenell on July 20, 2003, testified that Ravenell's face was swollen and that she told him that Beneche had hit her. Beneche was then arrested,[19] which angered him greatly.

---

[18]Beneche did not bring his claim for ineffective assistance of counsel as part of a motion for a new trial but raises it for the first time on direct appeal. We "will reverse in these circumstances only if the factual basis for the claim 'appears indisputably on the trial record.' " *Commonwealth* v. *Hurley*, 455 Mass. 53, 71 (2009), quoting *Commonwealth* v. *Zinser*, 446 Mass. 807, 811 (2006).

[19]This evidence was not objected to when admitted. By way of background,

Defense counsel moved to strike the testimony, but the judge refused, agreeing with the Commonwealth that it was not hearsay and not propensity evidence, but instead was probative of Beneche's state of mind regarding Ravenell regardless of whether it was true. The judge then gave the jury a limiting instruction, cautioning that the evidence was not being admitted to show that Beneche "is a violent person," "has a propensity for committing violent or bad acts," or "committed some violent act against Ravenell in the past," but instead that it "may shed some light on the nature of the relationship" between Beneche and Ravenell.

The second prior bad act challenged was an officer's testimony that he responded to a domestic disturbance call at Ravenell's apartment on September 3, 2003, and that both Beneche and Ravenell claimed that each had been hit by the other person. Defense counsel objected, and again the judge gave the jury a limiting instruction. Last, the Commonwealth presented evidence that on January 15, 2004, the police investigated alleged threats made to Ravenell from a female using Beneche's telephone.

While evidence of the defendant's prior bad acts is not admissible to show bad character or propensity to commit a crime, *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986), such evidence is admissible if relevant to show the defendant's motive, intent, or state of mind, see *Commonwealth* v. *O'Laughlin*, 446 Mass. 188, 208 (2006). See also Mass. G. Evid. § 404(b), at 46-47 (2010). We will uphold a trial judge's decision to admit prior bad acts evidence absent clear error. *Commonwealth* v. *O'Laughlin, supra.* There was no such error here. Evidence of the prior bad acts in this case was not admitted for its truth, but to show the hostile relationship between Ravenell and Beneche that contributed to his motive for the murders.[20] See *Commonwealth* v. *Butler*, 445 Mass. 568, 575 (2005) (evidence

the judge previously had told the attorneys that he would admit evidence regarding the hostility of the relationship between Beneche and Ravenell, but at a bench conference after this evidence was admitted, the judge clarified that he would have admitted the complaint that arose from the incident, and was not sure he would have let in the officer's testimony regarding Ravenell's statement. Defense counsel indicated that she did not object because she thought such testimony was covered by the judge's prior ruling about evidence of hostility. Then defense counsel moved to strike, and the judge denied the motion.

[20]The judge did not give a limiting instruction with respect to the evidence

of prior bad act admissible as "probative to demonstrate the hostile nature of the relationship between the defendant and [the victim]"); *Commonwealth* v. *Bianchi*, 435 Mass. 316, 322 (2001) (evidence of defendant's prior assault on victim admissible "to show the hostile nature of the relationship," "state of mind and motive to kill").[21]

8. *Review under G. L. c. 278, § 33E.* Having reviewed all aspects of the record in accordance with our obligations under G. L. c. 278, § 33E, including consideration of issues Beneche did not raise on appeal,[22] we discern no substantial likelihood of

concerning the January, 2004, investigation into the threatening telephone calls made by Deane allegedly with the help of Beneche. Assuming that the judge erred in failing to give this instruction, there was no objection, and there was no substantial likelihood of a miscarriage of justice caused by the lack of this limiting instruction.

[21]Beneche argues also that when the officer testified that Ravenell stated that Beneche had hit her, the Commonwealth violated his confrontation rights protected by the Sixth Amendment to the United States Constitution. Because Ravenell's statement was to a police officer, Beneche contends that it was testimonial, and because he had no opportunity to cross-examine Ravenell, he argues that its admission at trial was a violation of *Crawford* v. *Washington*, 541 U.S. 36, 42 (2004). However, the admission of a testimonial statement without adequate opportunity to cross-examine the declarant violates the confrontation clause only if the statement is offered to prove the truth of the matter asserted. *Commonwealth* v. *Hurley*, *supra* at 65 n.12, citing *Crawford* v. *Washington*, *supra* at 59-60 & n.9. Because Ravenell's testimony that Beneche struck her was not admitted for the truth, but for other relevant non-hearsay purposes, there was no confrontation clause violation. See *Commonwealth* v. *Hurley*, *supra*.

[22]Although not raised by the defendant, we also conclude that there was error in the admission of deoxyribonucleic acid (DNA) evidence that Deane's hair had been found in the bag with Ravenell's body and on the child's body. Two criminalists with the Boston police department crime laboratory testified that the hair from the crime scene, along with a sample from Deane, had been sent for DNA testing to a Federal Bureau of Investigation laboratory in another State and that the laboratory had found that the hair found at the scene was "consistent with being the hair from Jessica Deane." This testimony was admitted in violation of the defendant's right to confrontation. See *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527 (2009); *Commonwealth* v. *Barbosa*, 457 Mass. 773, 786 (2010). Also, the DNA evidence that Deane could not be "excluded" as the source of the hair at the crime scene was not admitted with relevant statistical data as required by *Commonwealth* v. *Mattei*, 455 Mass. 840, 842 (2010). These unraised errors do not merit a new trial. The defendant's theory was that Deane committed the murders; testimony that her hair was found with Ravenell and the child's bodies was consistent with this theory and therefore was not prejudicial.

a miscarriage of justice in the jury's verdicts. We conclude that the evidence supported Beneche's conviction of both murders in the first degree, he was represented by effective counsel, there were no errors in the judge's instructions to the jury, and the testimony that was improperly admitted did not raise a substantial likelihood of a miscarriage of justice. Accordingly, we decline to exercise our power to reverse the verdicts and order a new trial, or to reduce the convictions to a lesser degree of guilt.

*Judgments affirmed.*