## COMMONWEALTH *VS.* CHARLES THOMPSON.

Hampden. December 8, 1999. - March 27, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, IRELAND, & COWIN, JJ.

*Evidence,* Verbal completeness, Alibi, Impeachment of credibility, Conscious-
ness of guilt, Admissions and confessions, Inference, Cross-examination.
*Practice, Criminal,* Required finding, Comment by prosecutor, Argument
by prosecutor, Admissions and confessions, New trial, Assistance of
counsel, Capital case. *Constitutional Law,* Assistance of counsel.

Evidence, including circumstantial evidence, at the trial of an indictment for
murder in the first degree was sufficient to satisfy a rational trier of fact of
each element of the crime beyond a reasonable doubt and the defendant's
motion for a required finding of not guilty was correctly denied. [113-114]
At a murder trial, the judge did not err in admitting in evidence only a portion
of the defendant's statement to police, as the doctrine of verbal complete-
ness was not applicable to the excluded portions which did not explain,
correct, qualify, or illuminate the statement that was read to the jury.
[114-115]
At a murder trial, there was no error in the judge's rulings with respect to a
police witness's testimony for which a proper foundation was laid.
[115-116]
At a murder trial, descriptive testimony regarding the defendant's prearrest,
pre-Miranda silence when told of his wife's death should not have been
admitted for purposes of proving consciousness of guilt; however no
substantial risk of a miscarriage of justice resulted where that evidence was
cumulative of other evidence that the defendant had acted in a manner
inconsistent with the behavior of an innocent person, and where there was
substantial other evidence of the defendant's guilt. [116-117]
At a murder trial, it was proper for the prosecutor to comment in closing argu-
ment on the defendant's failure to ask appropriate questions that an in-
nocent party would ask of the police about the death of his wife, the
victim, or the condition of their child, in the course of his voluntarily giv-
ing a far-ranging statement over the course of several hours in which he
maintained his innocence and did not at any time invoke his right to
remain silent. [117-118]
In a criminal case, the prosecutor's comment on the credibility of certain wit-
nesses was based on the evidence. [118-119]
Error, if any, in a prosecutor's questions on cross-examination of a defense
witness did not prejudice the defendant. [119]
No reason appeared, on the record of a murder trial, for this court to conclude
that trial counsel had provided ineffective assistance of counsel. [120-121]

INDICTMENT found and returned in the Superior Court Department on August 23, 1995.

The case was tried before *Daniel F. Toomey*, J., and motions for a new trial and for reconsideration were heard by him.

*Brownlow M. Speer*, Committee for Public Counsel Services (*Stephanie Page*, Committee for Public Counsel Services, with him) for the defendant.

*Marcia B. Julian*, Assistant District Attorney (*James C. Orenstein*, Assistant District Attorney, with her) for the Commonwealth.

IRELAND, J. A jury found the defendant, Charles Thompson, guilty of the murder in the first degree of his wife, Andrea Thompson, on theories of deliberate premeditation and extreme atrocity or cruelty.[1] The defendant appeals from his conviction and makes the following claims of error: (1) the judge should have granted his motion for a required finding of not guilty; (2) the admission of only a portion of the defendant's statement to police, rather than the entire statement; (3) evidentiary rulings; (4) references to the defendant's silence; (5) inappropriate comments in the prosecutor's closing argument. The defendant also (6) challenges the denial of his motion for a new trial and makes claims of (7) alleged ineffective assistance by his trial counsel. We see no reason to grant the defendant a new trial or enter a verdict of a lesser degree of guilt pursuant to G. L. c. 278, § 33E, and accordingly affirm the conviction.[2]

The victim and the defendant were married for five years and had one child together, but had separated in May, 1995, after a series of incidents in which the defendant had struck the victim, been orally abusive toward her, and threatened to kill her. During their marriage, the victim and the defendant lived together

---

[1]The jury also found the defendant guilty of violating a protective order his wife had obtained against him. That conviction was filed with the defendant's consent and is not part of this appeal.

[2]Represented by new counsel on appeal, the defendant filed a motion for a new trial pursuant to G. L. c. 278, § 33E, in this court. We remanded the matter to the Superior Court for disposition and stayed appellate proceedings. After an evidentiary hearing, the trial judge denied the motion. The defendant then filed a motion for reconsideration of his motion for a new trial in this court, along with his brief on appeal from the denial of the motion for a new trial. We remanded that motion for disposition. The trial judge denied the motion for reconsideration and the stay of appellate proceedings was dissolved. The defendant then filed a notice of appeal from the denial of the motion for reconsideration.

on the second floor of her parents' (Rexers') West Springfield home. After the separation, the victim continued to live at her parents' home with her daughter. The victim and the defendant both worked at Ludlow Technical Products (Ludlow Tech) in Chicopee, about fifteen minutes away from her parents' home.

After an incident on May 30, 1995, during which the defendant confronted the victim at Ludlow Tech, grabbed her, forced her against a wall and threatened to kill her, the victim obtained a protective order against him. The next day, John Podkowka, the defendant's supervisor, spoke to the defendant about his behavior. The defendant became "irate" and told Podkowka that "he would kill the fucking bitch, there was no way that she was going to either go out with anybody or ever have his child by herself and his money and everything."

The protective order granted the defendant limited visitation with his three year old daughter. On scheduled visits, the victim's mother would meet with the defendant to pick up or deliver the child. On July 6, 1995, however, the victim's mother was out of town. A relative, who had been asked to meet the defendant at the Rexers' house on that particular day to facilitate the defendant's visitation arrangement, drove up and observed the defendant coming out of the Rexers' house. The defendant admitted to her (and later admitted in his statement to the police) that he had broken into the Rexers' home through a window off the kitchen on the first floor.

On the evening of August 2, 1995, the victim and her daughter returned to her parents' home at approximately 8:45 P.M. The Rexers were in their bedroom, and the victim opened the door to their room to let in one of the four dogs that lived in the house. The victim's mother fell asleep at approximately 9:30 P.M.; her father fell asleep at 11:30 P.M. The Rexers slept through the night; they did not hear the dogs bark or anything else unusual.

At about 6:20 A.M. the next morning (August 3), the victim's mother, thinking that the victim had overslept, went to her bedroom and found her dead. At the scene, the police noted that the victim's clothes were heavily stained with blood. She had been stabbed in the abdomen, and her intestines were evulsed. An officer found coins, one quarter on the bed near her body, and two more quarters on the floor near her bed. Directly across the hall from her bedroom, blood was found on a door to the den. Another door inside the den had blood smears on a

doorknob and on the door. In a room (known as the "bird room") adjoining the den, a window was completely open; there was blood on the window sill and along the metal base of the window screen. No fingerprints were found in any of the blood smears. No one else was harmed, and nothing was stolen from the house. The medical examiner testified that the victim had been stabbed twenty-four times with a blade of at least four to five inches in length. There was no indication of a sexual assault.

At approximately 9:30 A.M. on August 3, West Springfield and Chicopee police officers first spoke to the defendant where he was "house sitting" for a coworker, Guy Anderson. After the defendant had allowed the officers in the home and had agreed to talk to them, Sergeant Paul Finnie of the West Springfield police department informed the defendant of his wife's death. Sergeant Finnie testified that the defendant made no response; he remained seated on a chair looking at the floor for approximately thirty seconds. The defendant then agreed to accompany the officers to the West Springfield police station. At the police station, State Trooper Carol Sprague and other officers interviewed the defendant. After being advised of his Miranda rights, the defendant said that he would cooperate fully. After another reading of his Miranda rights, the defendant gave an oral statement, over a six-hour period. Trooper Sprague contemporaneously typed the statement. The defendant made some corrections to the statement and then signed the document, adding, "This statement is voluntary."

In his statement, the defendant recounted his quarrels, violence, and threats toward his wife; stated that he did not think that she had any enemies; and said that he had "no idea" who would have killed her. He said that he had not done so. The defendant gave a detailed account of his whereabouts on August 2-3. He identified with particular detail the various "weapons" to which he had access.

While the defendant was in the process of reviewing his statement, Trooper Sprague reentered the interview room and asked the defendant if anyone had told him how his wife had died. The defendant said, "Well, I take it she was stabbed to death." Trooper Sprague replied, "What makes you think that she was stabbed to death?" The defendant responded, "Because you kept asking me about all my knives." Trooper Sprague testified that neither she nor anyone else in her presence had

informed the defendant as to the manner of his wife's death. She also noted that the police had not informed the defendant of the condition of his daughter, and the defendant had not inquired about her well-being. Further, when Trooper Sprague commented that she thought it was a shame that his daughter would never see her mother again, the defendant responded, "How do you think she made me feel when she took my daughter away?"

Finally, when Trooper Sprague asked what items of value in the house could interest a potential burglar, the defendant mentioned the victim's jewelry and her wedding rings. A search of the house where the defendant had been staying revealed the victim's wedding rings rolled up in the defendant's sleeping bag.

While the defendant was at the West Springfield police station on August 3, a police chemist conducted an ortho-tolidine "screening" test for occult (nonvisible) blood. The test was positive on the cuticle and palm areas of both his hands; the other parts of the defendant's body that had been "screened" tested negative. The defendant's vehicle also tested positive on the exterior door handles on both sides of the vehicle, the gear shift, the steering wheel, the ignition, and the door strap on the driver's side.[3] The chemist recovered a shirt on the driver's seat that contained seventeen quarters in a chest pocket.

The defendant's time card indicated that he started work at 6:30 P.M. on August 2 and ended at 5:04 A.M. on August 3. Marco Flemati, the defendant's warehouse supervisor, testified that although the defendant had been scheduled to work a daily twelve-hour shift from 7 P.M. to 7 A.M. the week ending August 5, he had made an advance request to leave early, at 5 A.M., on the morning of August 3. Further, because the defendant complained that his radio frequency (RF) unit was not working properly, the defendant logged all his work transactions by hand. Had the RF unit been functioning properly, it would have recorded the precise times of the defendant's transactions. His supervisor further testified that the RF unit appeared to work the next day, and that no one had ever reported a similar problem. His supervisor also stated that the defendant had averaged three transactions an hour on the night in question, whereas a more typical number would be eight to ten transactions an hour. Finally, Flemati testified that the completed manufacturing

---

[3]The defendant's vehicle was towed to the station.

product that the defendant was supposed to move had been left in the manufacturing hold for eight to ten hours. One coworker and friend of the defendant, Robert E. Jaszek, Jr., testified that there was no supervision during the night shift; that it was possible to leave the building without punching out at the time clock; and that he personally knew it was possible to be absent from work for one to two hours.

The defendant contended that he had no opportunity to commit the murder, given that he had been working the night shift at Ludlow Tech on the evening in question.[4] Eleven Ludlow Tech employees testified to having observed the defendant at different times during the overnight shift. Specifically, one coworker, Terry Mercier, testified that she had seen the defendant repeatedly, at forty-five minute intervals throughout their shift with an exception for the period between 1 and 3 A.M., when she heard the defendant being paged over the intercom for approximately twenty minutes. She testified that there were areas in the warehouse where one might not hear a page. Another coworker, Roger Beaudoin, testified that he had seen the defendant sometime between 1:30 and 2 A.M., and coworker Steve Sicard testified that he had seen the defendant either at 2:30 A.M. or, as he agreed on cross-examination, fifteen to twenty minutes after he came in at 2:20 A.M. Two coworkers testified that they had seen the defendant just prior to the 3 A.M. "lunch" break, and that he brought food back from a McDonald's restaurant. The defense also presented evidence that a warehouse worker at Ludlow Tech, such as the defendant, had only one hour to make deliveries on receiving a request.

1. *Motion for a required finding of not guilty.* The defendant claims that the Commonwealth's case against him was legally insufficient because the Commonwealth did not produce any direct evidence, or sufficient circumstantial evidence, that he was at or near the murder scene on August 2 or 3.

Circumstantial evidence "is competent to establish guilt beyond a reasonable doubt." *Commonwealth* v. *Bush,* 427 Mass. 26, 30 (1998). The Commonwealth, however, must prove more than just the fact that the defendant had an opportunity to commit the crime, see *Commonwealth* v. *Anderson,* 396 Mass. 306, 311-312 (1985), or had a motive to do so. See *Commonwealth*

---

[4]The defendant also presented evidence of another stabbing that had occurred roughly one month after he was placed in custody, inviting the jury to draw the inference that the perpetrator was still at large.

v. *Cordle*, 404 Mass. 733, 739 (1989), *S.C.*, 412 Mass. 172 (1992). Rather, "we must determine whether the evidence, read in a light most favorable to the Commonwealth, was sufficient to satisfy a rational trier of fact of each element of the crime beyond a reasonable doubt." *Commonwealth* v. *Basch*, 386 Mass. 620, 622 (1982), citing *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979).

In this case, the Commonwealth produced abundant direct evidence of the defendant's hostility and aggression toward the victim. Apart from motive, the Commonwealth produced evidence of the defendant's opportunity to commit the crime; forensic evidence of "occult blood" on the defendant's hands and his car; a prior break-in by the defendant to the Rexer home; quarters at the crime scene and in the defendant's shirt that was seized from his car; the absence of any sexual assault on the victim, robbery, or injury to any other occupant of the house; the defendant's unusual behavior including absence of any inquiry as to the manner of his wife's death or the well-being of his daughter, the defendant's later assumption that his wife had been stabbed even though he had not been informed of the circumstances of his wife's death, and his false statements to the police about items that he had taken from his wife's bedroom. The evidence showed that the four dogs in the house did not bark on the night of the murder, as they normally did when strangers arrived at the house. It would be reasonable for the jury to infer that the defendant, having lived in the house, had specialized knowledge of its unique layout, the location of the victim's bedroom, the window mechanism in the "bird room" and the presence of his in-laws and family dogs on the first floor, and that with this knowledge he could avoid creating any disturbance.

Altogether, the Commonwealth produced a "mosaic of evidence" that "warranted the jury in returning their verdict." *Commonwealth* v. *Salim*, 399 Mass. 227, 233 (1987). In this case, "[t]he evidence was substantial enough so that the question of guilt was not left to conjecture or surmise." *Commonwealth* v. *Cordle*, 404 Mass. 733, 742 (1989), quoting *Commonwealth* v. *Anderson*, *supra* at 313. The defendant's arguments are directed toward the weight and credibility of the evidence, "a matter wholly within the province of the jury." *Commonwealth* v. *Martino*, 412 Mass. 267, 272 (1992).

2. *Exclusion of portion of the defendant's statement and the*

*doctrine of verbal completeness.* Relying on the doctrine of verbal completeness, the defendant claims that the judge erred in admitting only a portion of the defendant's statement to the police. We do not agree.

The doctrine of verbal completeness stands for the principle that "[w]henever statements of a person are put in evidence, all that was said or written by him at the same time and upon the same subject becomes admissible; but other statements, even though made at the same time, are not admissible unless they are upon the same subject matter." *Commonwealth* v. *Watson,* 377 Mass. 814, 828 (1979), quoting W.B. Leach & P.J. Liacos, Massachusetts Evidence 320 (4th ed. 1967). "The single purpose of considering the utterance as a whole is to be able to put a correct construction upon the part which the first party relies upon . . . ." *Commonwealth* v. *Watson, supra* at 829-830.

The admitted portion of the defendant's police statement contains details of the defendant's relationship with the victim; past arguments and incidents of physical abuse; the last time the defendant saw the victim; one incident in which the defendant admitted breaking into her house; a description of guns and knives the defendant owned; details about the victim's dogs and her parents' three dogs; and the defendant's statement that he did not break into the victim's house that night, that he did not kill her, and that he did not know who could have done it. The excluded portion of the defendant's police statement primarily concerns the defendant's alibi, the defendant's whereabouts on the night of the murder, and a description of the defendant's workplace.

Here, because there is nothing in the excluded portion that helps correct the construction of the statement that was read to the jury, the doctrine of verbal completeness does not apply. Therefore, it was not error for the judge to exclude that portion of the defendant's statement that dealt with his alibi. See *Commonwealth* v. *Sires,* 413 Mass. 292, 305 (1992) (doctrine of verbal completeness does not give defendant right generally to supplement admitted evidence, but only to explain, qualify, contradict, or illuminate); *Commonwealth* v. *Watson, supra* at 833.

3. *Evidentiary rulings regarding Trooper Sprague's testimony.* At one point during the Commonwealth's case, the prosecutor asked Trooper Sprague, who conducted the interrogation of the defendant, whether the defendant had been informed of the

condition of his daughter. Trooper Sprague answered, "Not at all that I'm aware of." The defendant argues that the judge's denial of his motion to strike this testimony for lack of personal knowledge was in error. The defendant's claim is without merit. Because Trooper Sprague was present and in a position to hear and see what occurred, a proper foundation was laid for her testimony which was based on her personal knowledge of the events. The defendant next asserts that there is a conflict between his statement and Trooper Sprague's testimony that the defendant had not been given any information about how his wife died, and that the evidence as to this subject could only be fairly resolved had the interrogation been tape recorded. We have reviewed the evidence and find no conflict between the statement and Trooper Sprague's testimony. Further, we have not imposed a duty on the police to record statements, rather leaving this issue as one to be explored on cross-examination. See *Commonwealth* v. *Diaz*, 422 Mass. 269, 273 (1996). There was, therefore, no error here.

4. *The defendant's silence.* a. *Pre-Miranda, prearrest silence.* During its case-in-chief, the Commonwealth elicited testimony from Sergeant Finnie that the defendant, when told of his wife's death, made no response and stared silently at the floor for thirty seconds. At that point the defendant was not in custody. Shortly thereafter, the defendant agreed to go with the officers to the police station, and Sergeant Finnie cautioned the defendant not to make any spontaneous remarks until he arrived at the police station, where he could make a statement. The defendant argues that the introduction of evidence that he stared silently at the floor for thirty seconds was improper, because the defendant had been warned not to make any spontaneous remarks. Because the defendant's thirty seconds of silence occurred *before* Sergeant Finnie cautioned the defendant to avoid making remarks, however, the defendant's argument is without merit.[5]

Sergeant Finnie's testimony, however, should not have been

---

[5]The prosecution also attempted to introduce evidence that, while en route to the West Springfield police station and in custody, but before having been advised of his Miranda rights, the defendant had not inquired as to the manner of his wife's death. On defense counsel's objection, the trial judge excluded this testimony from evidence and gave a curative instruction. The judge's ruling was proper.

admitted for reasons other than those raised by the defendant.[6] While the admission of a defendant's prearrest silence does not violate the due process principles of the Federal Constitution, *Jenkins* v. *Anderson*, 447 U.S. 231, 239 (1980), in *Commonwealth* v. *Nickerson*, 386 Mass. 54, 62 (1982), we noted that "impeachment of a defendant with the fact of his pre-arrest silence should be approached with caution."

Although the circumstances of this case are different from those of *Commonwealth* v. *Nickerson, supra,*[7] the testimony relating to the defendant's silence should not have been admitted. As we stated in *Commonwealth* v. *Nickerson, supra* at 61, "Although most lay people do not know the intricacies of their constitutional rights, it is a generally held notion that one does not have to say anything to the police and that what one does say may be used against [one]." Further, testimony regarding the defendant's action of staring at the floor should not have been admitted for purposes of proving consciousness of guilt. See *Commonwealth* v. *Harris*, 371 Mass. 462, 477 (1976) (defendant's hanging his head and biting his lips not admissible as nontestimonial admission demonstrating consciousness of guilt).

Although the admission of this evidence was error, neither the testimony nor the prosecutor's closing argument were the subject of an objection. Considering that "this testimony was a brief event in the course of a long trial," cumulative of other evidence that the defendant acted in a manner inconsistent with the behavior of an innocent person, and there was substantial evidence against the defendant, neither the introduction of the evidence nor the prosecutor's comment on it presents a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Grenier*, 415 Mass. 680, 690 (1993).

b. *The defendant's post-Miranda statements.* During closing argument, the prosecutor urged the jury to consider what the defendant had not said to the police during his custodial inter-

---

[6]The defendant cursorily points to *Doyle* v. *Ohio*, 426 U.S. 610 (1976), for his argument that the admission of the testimony was error. The *Doyle* case, however, along with *Commonwealth* v. *Peixoto*, 430 Mass. 654, 657-660 (2000), dealt with a testifying defendant who was impeached with post-Miranda silence. This case involves noncustodial, pre-Miranda silence.

[7]Here the defendant did not testify and the evidence of silence was ostensibly used as consciousness of guilt, not for the impeachment of a testifying defendant.

rogation, namely that he did not make any inquiry of the police about what had happened to his wife or about the condition of his daughter. The prosecutor said that there was "only one reasonable conclusion why you don't ask and that is because you already knew and you knew it was so horrible you didn't even want to hear about it any more."[8]

"There is no question that . . . evidence of a criminal defendant's postarrest, post-Miranda silence cannot be used for the substantive purpose of permitting an inference of guilt . . . ." *Commonwealth* v. *Mahdi*, 388 Mass. 679, 694 (1983). In *Commonwealth* v. *Haas*, 373 Mass. 545, 558-559 (1977), *S.C.*, 398 Mass. 806 (1986), we held that the prosecutor's comments, asking the jury to infer guilt from the fact that a defendant had not spontaneously volunteered his innocence during an interrogation by the police, were improper.

By contrast, here, the defendant maintained his innocence to the police, and that portion of the statement was introduced to the jury. In addition, the prosecutor here did not comment on the defendant's failure to proclaim his innocence, but rather on his failure to ask appropriate questions that an innocent party would ordinarily ask. The defendant did not invoke at any time his right to stop the questioning and be silent. Instead, the defendant agreed to give a far-ranging statement over several hours. It was therefore proper for the prosecutor to comment on the fact that the defendant did not ask appropriate questions. See *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 513 (1992); *United States* v. *Goldman*, 563 F.2d 501, 503-504 (1st Cir. 1977), cert. denied, 434 U.S. 1067 (1978). See also *Commonwealth* v. *Lavalley*, 410 Mass. 641, 649 (1991) (defendant's failure to tell police he was with victim and had intercourse with her constituted false statement and prosecutorial comment thereon permissible).

5. *The prosecutor's closing argument.* The defendant argues that the prosecutor misstated the evidence when he told the jury that "no one saw him [the defendant] between the hours of one thirty and about two forty." The prosecutor, however, had immediately added, "No credible evidence." Two defense witnesses did testify that they had seen the defendant between

---

[8]The defendant did not object to the prosecutor's closing. We therefore review this alleged error to determine whether there was a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Freeman*, 430 Mass. 111, 121 (1999).

those times, but had been impeached on cross-examination as to when those particular sightings of the defendant occurred. The prosecutor's statement was a reasonable comment on the evidence, and there was therefore no error. See *Commonwealth v. Murchison*, 418 Mass. 58, 59-60 (1994).

6. *Motion for a new trial.* After his conviction, the defendant filed a motion for a new trial, and, after an evidentiary hearing, the trial judge denied that motion on the merits.[9] See note 2, *supra*. "[A]ny issue argued in the appeal from the denial of a motion for a new trial that the motion judge fully addressed on its merits must be considered as if properly preserved for direct appeal." *Commonwealth v. Hallet*, 427 Mass. 552, 555 (1998). After undertaking an independent analysis of the defendant's claims, we conclude that a new trial is not warranted.[10]

Cynthia Anderson, one of the owners of the house where the defendant was "house sitting" the week of the murder, testified that the defendant left her house in a tidy condition. The defendant offered this evidence to demonstrate that he did not clean himself up after the murder at the Anderson house. During the prosecutor's cross-examination of Cynthia Anderson, the prosecutor asked her several questions about marks in her bathroom that "looked to you like blood" in order to impeach Anderson's testimony that her house was neat. When asked whether she had learned whether the stain was blood, Anderson replied that she had not and that the stain "could have been anything." The stains, however, had previously tested negative for blood.

A prosecutor cannot ask questions on cross-examination "to imply the truth of a proposition which the prosecutor [knows] to be false." *Commonwealth v. Fitzgerald*, 376 Mass. 402, 415 (1978). Here, the prosecutor's references to blood skirted the bounds of proper cross-examination. Even if there were error, however, the cross-examination did not prejudice the defendant. The chemist who testified to all the blood evidence in the case did not mention any stains in Anderson's house, and the prosecutor did not refer to the stains in his closing argument. Anderson's testimony regarding the stains was insignificant.

---

[9]The judge's memorandum on the defendant's claims was well-reasoned, sound, and consistent with governing law.

[10]In his motion for a new trial, the defendant makes several claims of ineffective assistance of counsel. The discussion of these claims is consolidated in Part 7.

7. *Ineffective assistance of counsel.* The defendant also alleges numerous errors based on ineffective assistance of trial counsel. We note that trial counsel called eleven witnesses to substantiate the defendant's alibi defense, and also called an expert witness to dispute the weight to be afforded to the defendant's positive results for "occult" blood on his hands. The record further demonstrates that trial counsel engaged in vigorous cross-examination of the Commonwealth's witnesses.

The defendant raises claims of ineffective assistance of counsel based on alleged errors discussed in Part 3 and Part 5 of this opinion. Because these were not errors, there could be no ineffective assistance of counsel. See *Commonwealth* v. *Cohen*, 412 Mass. 375, 389 (1992).[11] The defendant also claims ineffective assistance of counsel based on his counsel's failure to object to the prosecutor's questions regarding the defendant's prearrest silence and those put to Cynthia Anderson regarding the stains in her bathroom. As mentioned in Part 4a and Part 6, if there were any error present in the prosecutor's questioning, it did not rise to the level of a substantial likelihood of a miscarriage of justice or harmful error, respectively. Thus, the failure to object on either of these issues did not constitute ineffective assistance of counsel. See *id.*; *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992).

The defendant contends that trial counsel was ineffective in the decision not to present evidence to the jury that his three year old daughter's "spontaneous utterances" regarding a "bad man" who had "hurt mommy" and later references to a "bad man" to relatives and the police.[12] The defendant argues that the child would not have referred to her father as a "bad man." However, in many of her statements, the defendant's daughter

---

[11]Apparently the defendant no longer argues, as he did at the hearing on the motion for a new trial, that trial counsel was ineffective by failing to present evidence about the difficulty of leaving Ludlow Tech on the night in question, both because of the security measures around the building and the likelihood of being seen by a coworker. In any case, this claim is without merit, given that our review of the record shows that trial counsel elicited substantial evidence on all of these points.

[12]When the victim's mother went upstairs on the morning of August 3 and discovered the victim, she also found that her three year old granddaughter was present. Although she was unharmed, the shirt that she wore was covered with blood, and a stuffed dinosaur toy covered with blood and stabbed with a knife was found in her room.

coupled her remarks about the "bad man" with "daddy." It would appear that trial counsel considered the implications of the introduction of the evidence, and made a strategic decision not to seek to introduce the evidence.[13] The evidence was as potentially inculpatory as it was exculpatory which demonstrates that this tactical decision was not ineffective assistance of counsel. See *Commonwealth* v. *Colantonio*, 31 Mass. App. Ct. 299, 304 (1991) (not ineffective assistance to decide against introduction of statement that while somewhat supportive was also damaging). For the same reason, the defendant's claim that counsel was ineffective for failing to file a motion to dismiss the indictment on the basis of the exclusion of his daughter's statements is unavailing.

The defendant argues that trial counsel was ineffective in failing to pursue his suggestion that the change machine at Ludlow Tech did not provide twenty quarters for a five dollar bill, but rather nineteen quarters and the balance in nickels.[14] The prosecutor elicited evidence that there was a change machine at Ludlow Tech, and briefly alluded to the coin changer in his closing argument. But the machines at Ludlow Tech were, obviously, not the only place to get change. As trial counsel explained during the evidentiary hearing, his strategy was to draw attention away from the quarters and instead focus the jury's attention on the absence of blood on the work shirt. This was a reasonable tactical decision.

8. *General Laws c. 278, § 33E.* We have reviewed the entire record, including merits of the defendant's motion for reconsideration of the denial of his motion for a new trial.[15] After this review of the record, we see no reason to grant the defendant a

___

[13]Trial counsel testified at the hearing on the motion for a new trial that he had spoken with several child psychologists who had advised him that the daughter's references to the "bad man" might have been her way of indirectly referring to bad acts by her father.

[14]Seventeen quarters were found in the pocket of the defendant's work shirt. Three quarters were found at the murder scene, one on the bed, and two on the floor next to the bed. The Commonwealth argued that the quarters linked the defendant to the scene of the crime.

[15]Although captioned as a motion for reconsideration, the substance of the motion is another motion for a new trial, because it raises a different claim than any of the issues raised in the first motion for new trial. The defendant asserts that a crime scene videotape depicts "four or five silver coins, at least one of which may be something other than a quarter, and a penny." This evidence, however, was available at the time of trial, so this is not new evidence. Further, a photograph of the crime scene, including the coins found,

new trial or enter a verdict of a lesser degree of guilt pursuant to G. L. c. 278, § 33E. We affirm the judgment of conviction and the orders denying the motions for a new trial and for reconsideration.

*So ordered.*

was introduced as a trial exhibit. The defendant is not entitled to a new trial, and further evidentiary hearings on this matter are not warranted. See *Commonwealth* v. *Stewart*, 383 Mass. 253, 259-260 (1981).