NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11751


COMMONWEALTH  vs.  THOMAS GARDNER.



Bristol.     November 10, 2017. - June 18, 2018.

Present:  Gants, C.J., Gaziano, Lowy, Budd, & Cypher, JJ.


Homicide.  Practice, Criminal, Cross-examination by prosecutor,
     Argument by prosecutor, Instructions to jury, Lesser
     included offense, Capital case.  Evidence, Cross-
     examination, Impeachment of credibility.




Indictments found and returned in the Superior Court
Department on July 25, 2012.

The cases were tried before Gary A. Nickerson, J.


Theodore F. Riordan (Deborah Bates Riordan also present)
for the defendant.
Stephen C. Nadeau, Assistant District Attorney, for the
Commonwealth.


LOWY, J.  On the morning of Saturday, November 5, 2011, the

defendant, Thomas Gardner, and the victim, Michael Duarte, met

to conduct a drug transaction at a house in New Bedford that was

owned by the defendant's ex-wife.  Four days later, after the

victim's girl friend had reported him missing, the police found

the victim's body wrapped in a painter's tarpaulin hidden beneath the basement stairs of that house. The police also found evidence of the victim's blood in the kitchen, and a trash bag outside the house that contained clothing and a hammer bearing both the victim's and the defendant's blood. Further investigation showed that the victim had died of blunt force trauma to the head. He had suffered nineteen lacerations to his head and had four skull fractures; these injuries were consistent with blows from a hammer.

A Superior Court jury convicted the defendant of murder in the first degree on the theory of extreme atrocity or cruelty.[1] The defendant appeals from his convictions, claiming that (1) the prosecutor's references to the defendant's prearrest silence during cross-examination and in closing argument were improper; (2) the prosecutor mischaracterized evidence during closing argument; and (3) the judge's instructions to the jury concerning lesser included offenses were erroneous. Although we agree that certain of the prosecutor's questions and comments concerning the defendant's failure to contact the police before his arrest were improper, we conclude that neither these errors nor the other arguments raised by the defendant created a substantial likelihood of a miscarriage of justice.

---

[1] The jury also found the defendant guilty of larceny of a motor vehicle; violation of an abuse prevention order; and larceny.

Accordingly, we affirm the defendant's convictions and decline to exercise our extraordinary authority to grant relief under G. L. c. 278, § 33E.

Facts. We summarize the facts relevant to this appeal as the jury could have found them, reserving certain details for later discussion. The victim lived in New Bedford with his girl friend and their two daughters. Shortly before 9 A.M. on November 5, 2011, the victim left his home, driving a Honda Civic automobile, after telling his girl friend that he was going to look at a house, located on Churchill Street, that was for sale. He was supposed to return home shortly to take care of his daughters. When the victim failed to return, his girl friend began calling him repeatedly on his cellular telephone beginning at 9:30 A.M., but she was unable to reach him. That afternoon, she drove to the house on Churchill Street that the victim had gone to see, but no one answered when she knocked on the door. Later that evening she contacted the New Bedford police to report that the victim was missing.

On the morning of November 9, officers with the Fairfield, Connecticut, police department learned that the victim's Honda Civic was at a rest area off of Interstate Route 95. When the first officer arrived, she observed the victim's vehicle parked at the far end of the parking lot, and the defendant sitting in the driver's seat.

When the defendant saw the police cruiser, he fled in the vehicle, reaching speeds in excess of one hundred miles per hour and, among other things, struck another vehicle and ran over the foot of a police officer. The defendant eventually lost control of the vehicle, abandoning it in a wooded area. He continued on foot until he reached Westport, Connecticut, where he entered a building that was under construction and hid.

Shortly afterward, police officers arrested the defendant as he walked through Westport. The defendant initially denied that he was Thomas Gardner and claimed that he was a construction contractor working on the building where he had been hiding.

The defendant was eventually transported to a police station in Fairfield, Connecticut, where he was questioned by a member of the Massachusetts State police and a detective with the New Bedford police department. The interview was recorded and later shown to the jury at trial.[2] After the police read the defendant the Miranda rights and informed him that the interview was being recorded, the defendant waived his rights and agreed

_____

[2] The defendant challenged the voluntariness of his statements. After a hearing, the motion judge found that the statements "were freely and voluntarily given beyond a reasonable doubt." After the videotape was played for the jury, and later in his final instructions, the trial judge told the jury that they should not consider the statements made by the defendant unless they found beyond a reasonable doubt that the defendant had made the statements and that he had made them voluntarily, freely, and rationally.

to speak with police.  The defendant stated that he was traveling with a "buddy" who was going to Florida and who had agreed to drop the defendant off at his mother's house in Pennsylvania on the way.  The defendant said that he and his friend had left New Bedford late in the evening on November 6 in the friend's Honda Civic.  En route, they pulled off at the Fairfield rest stop, where they remained for two days.  The defendant said that his friend had been inside a restaurant at the rest stop when the police cruiser had appeared, and that the defendant fled without him in the Honda Civic.  After some prompting, the defendant indicated that the person he had been traveling with was the victim, who, he suggested, was going to Florida to get away from his girl friend.  After further questioning about his trip, the defendant terminated the interview.

Later that same day, the New Bedford police department contacted the defendant's ex-wife and obtained her permission to search the Churchill Street house.  There, the police discovered the victim's body hidden beneath a staircase in the basement, wrapped in a painter's tarpaulin secured with tape, with a plastic bag placed over his head.  A paint can, a white painter's cloth, and other painter's materials had been piled on top of the body.  In the kitchen, blood was found on the floor, a ceiling fan, and a wall clock.  Police also detected blood on

the basement stairs.  There was testimony that the blood on the wall clock in the kitchen belonged to the victim.  Outside the house, the police discovered a trash bag containing a sweatshirt with both the victim's and the defendant's blood on a sleeve, a T-shirt with the victim's blood on the back, and a hammer bearing both the victim's and the defendant's blood.  Subsequent investigation of the defendant's cellular telephone showed that on November 5, 2011, the defendant had called the victim at 8:24 A.M. and 10:47 A.M., and that the victim had called the defendant at 8:38 A.M. and 9:06 A.M.

The medical examiner testified that the victim's death was caused by blunt force trauma to the head and brain injuries. The victim had suffered nineteen lacerations and two abrasions to his head; thirteen of the lacerations went to the bone. There were four distinct skull fractures.  All of these injuries were consistent with having been caused by blows from a hammer. All the injuries were inflicted at around the same time and, although any one laceration alone could have been fatal, there was no way to determine the order in which the injuries were sustained, which injury rendered the victim unconscious, or which caused his death.  The victim also had lacerations on his face, bleeding around both eyes, and minor abrasions on his right hand.  He was missing some teeth that were later

discovered in his stomach. The medical examiner opined that the victim had swallowed them prior to his death.

At trial, the defendant testified in his own defense. He admitted that he had killed the victim with the hammer that the police had found, but claimed that he had acted in self-defense. He testified that he was living at the Churchill Street house and that, on the morning of November 5, 2011, he had arranged to meet the victim there to buy heroin from him. When the defendant gave the victim money for the heroin purchase, however, the victim became angry because the defendant already owed him money and did not have enough cash for the new purchase. According to the defendant, the victim punched him and a fight ensued, during which the victim tackled him and slammed him to the floor; the victim then got on top of the defendant, putting his knees on the defendant's chest and his hands around the defendant's throat, choking him. The defendant testified that he then grabbed a hammer from a nearby shelf and began "slapping" the victim's head with the side of the hammer before finally striking him with the face of the hammer and knocking him out briefly. After the defendant stood up and tried to catch his breath, however, the victim regained consciousness, grabbed the defendant's pants leg, and tried to yank the defendant back down to the ground. At that point, the defendant testified, he struck the victim again with the face of

the hammer, killing him.  The defendant then wrapped the victim's body in a tarpaulin and put it in the basement; disposed of the hammer and clothes in the trash; took the money from the victim's wallet; sent a false text message to the victim's cellular telephone asking him why he had not yet arrived; hid the victim's wallet and the victim's cellular telephone; and arranged to meet a friend to sell him the victim's drugs.  The next day the defendant fled New Bedford.

Discussion.  1.  Prosecutor's references to the defendant's prearrest silence.  The defendant argues that the prosecutor improperly cross-examined him about his prearrest silence,[3] and exploited that evidence in closing argument, in violation of the common law and his privilege against self-incrimination under art. 12 of the Massachusetts Declaration of Rights.  The Commonwealth contends that the prosecutor's cross-examination concerning the defendant's prearrest silence was permissible in light of the omissions and falsehoods in the defendant's postarrest statements.

---

[3] "Prearrest" silence occurs in the period prior to custody, "[w]hen a citizen is under no official compulsion whatever, either to speak or to remain silent."  Jenkins v. Anderson, 447 U.S. 231, 243-244 (1980) (Stevens, J., concurring).  See Commonwealth v. Nickerson, 386 Mass. 54, 55, 60 (1982). "Postarrest" silence is silence at the time of arrest and after receiving Miranda warnings.  See Doyle v. Ohio, 426 U.S. 610, 618-619 (1976).  See also Fletcher v. Weir, 455 U.S. 603, 605-606 (1982) (per curiam).

We begin our analysis by noting that we have not previously considered whether art. 12 prohibits use of a defendant's prearrest silence for impeachment.  See Commonwealth v. Nickerson, 386 Mass. 54, 59 (1982).[4]  Instead, we have resolved issues involving use of a defendant's prearrest silence for impeachment on evidentiary grounds.  See Commonwealth v. Niemic, 472 Mass. 665, 672-673 (2015); Nickerson, supra at 60-61.[5]

We first addressed the use of a defendant's prearrest silence for impeachment in Nickerson, 386 Mass. at 54.  We recognized that where a defendant does not contact the police to tell them his story before he is arrested, and later testifies at trial to facts that he failed to disclose to the police before his arrest, the defendant's prearrest silence typically is of limited probative value with respect to the credibility of his testimony.  See id. at 60-61 & n.6.  We explained that there may be many reasons why a defendant does not wish to come

---

[4] "The Supreme Court of the United States . . . held that a defendant's pre-arrest silence may be used to impeach him without denying fundamental fairness guaranteed by the Fourteenth Amendment" to the United States Constitution, but "left it to the States to determine under their own rules of evidence when pre-arrest silence is so inconsistent with a defendant's testimony that impeachment by reference to that silence is probative." Nickerson, 386 Mass. at 59, citing Jenkins, 447 U.S. at 239.

[5] The defendant in Nickerson, 386 Mass. at 59, made no claims under the Massachusetts Constitution, and accordingly we decided the case solely on common-law grounds.  See Irwin v. Commonwealth, 465 Mass. 834, 852 n.31 (2013).

forward and speak to the police that have no bearing on his guilt or innocence.  See id. at 61 n.6.  "[A]n individual's failure to speak may be the result of his awareness that he has no obligation to speak, his caution arising from knowledge that anything he says may be used against him, and his belief that efforts to exonerate himself would be futile."  Id., citing People v. Conyers, 52 N.Y.2d 454, 458 (1981).  Moreover, "some individuals [may] not come forward because they want to avoid contact with the police."  Nickerson, supra.

Jurors, however, who may not recognize the wide variety of alternative explanations for a defendant's prearrest silence, may overvalue such evidence and "construe such silence as an admission and, as a consequence, may draw an unwarranted inference of guilt."  Nickerson, 386 Mass. at 61 n.6, quoting Conyers, 52 N.Y.2d at 459.  Given these circumstances, allowing a defendant to be impeached based on his prearrest silence may result in substantial prejudice to that defendant, "burden[ing] his right to testify in his own defense."  Nickerson, supra at 61, citing Jenkins v. Anderson, 447 U.S. 231, 246 (1980) (Marshall, J., dissenting).

Consequently, we advised in Nickerson, 386 Mass. at 62, that "[i]n general, impeachment of a defendant with the fact of his prearrest silence should be approached with caution, and, wherever it is undertaken, it should be prefaced by a proper

demonstration that it was 'natural' to expect the defendant to speak in the circumstances." The trial judge may consider conducting a voir dire in these circumstances and, "if the evidence is admitted, the judge should, on request, instruct the jury to consider that silence for the purposes of impeachment only if they find that the witness naturally should have spoken up in the circumstances." Id.[6]

Applying this test to the situation in Nickerson, 386 Mass. at 55, 61-62, where the defendant testified at trial that another person had committed the assault and battery at issue, we held that it was improper for the judge to instruct the jury that, in assessing the defendant's credibility, they could consider the defendant's failure to give this information to the police before his arrest. We reasoned that, if the defendant had volunteered this information to the police, it would have shown that he was at the scene of the crime when it was committed, had seen the victim attacked and the weapon used, and knew the identity of the attacker -- information that "would

---

[6] In contrast to impeachment of a testifying defendant, before a witness other than the defendant can be impeached with his or her failure to report exculpatory evidence to police, the Commonwealth must establish "[1] that the witness knew of the pending charges in sufficient detail to realize that he possessed exculpatory information, [2] that the witness had reason to make the information available, [and] [3] that he [or she] was familiar with the means of reporting it to the proper authorities." Commonwealth v. Hart, 455 Mass. 230, 238 (2009), quoting Commonwealth v. Brown, 11 Mass. App. Ct. 288, 296-297 (1981).

have gone a long way toward proving that the defendant committed the crime charged and, as an admission, would have been admissible as tending to prove his guilt." Id. at 60. Hence "[i]t would not have been 'natural' for the defendant to have come forward . . . and produce incriminating evidence against himself." Id.

More recently, in Niemic, 472 Mass. at 668-669, 673, a murder case where the defendant took the stand to testify that he had stabbed the victim in self-defense, we also held that it was error for the prosecutor to cross-examine the defendant about his failure to contact police and tell them about his alleged self-defense before his arrest. As in Nickerson, 386 Mass. at 60, we concluded that "it would not have been natural for [the defendant] to seek out police to tell his exculpatory story." Niemic, supra at 673.[7] See Commonwealth v. Irwin, 72

_____

[7] It is important to distinguish the situation where a defendant is being questioned about his or her failure to contact the police, however, from the situation where a defendant is being questioned about omissions in prearrest statements or inconsistencies between those statements and the defendant's later testimony. For example, although we held in Commonwealth v. Niemic, 472 Mass. 665, 672-673 (2015), that it was improper for the prosecutor to question the defendant about his failure to contact the police to tell them that he had stabbed the victim in self-defense, we also held that the prosecutor could properly question the defendant about voluntary prearrest statements that he had made to civilian witnesses in which he had omitted any mention of self-defense, where it would have been natural for him to explain that he had been acting in self-defense. See Commonwealth v. Greineder, 458 Mass. 207,

Mass. App. Ct. 643, 653-654 (2008) (prosecutor's focus during cross-examination of defendant and in closing argument on defendant's refusal to participate in prearrest interview with police detective was improper); Commonwealth v. Ewing, 67 Mass. App. Ct. 531, 544-545 (2006), S.C., 449 Mass. 1035 (2007) (prosecutor's remarks urging jury to discredit defendant's testimony because he did not contact police prior to trial after learning of charges not proper).

There are, however, situations where a defendant's testimony suggests that it would have been natural for him to contact police in the circumstances described, and in those cases it is appropriate for the prosecutor to cross-examine the defendant about his failure to do so. For example, in Commonwealth v. Barnoski, 418 Mass. 523, 524, 534 (1994), the Commonwealth alleged that the defendant had shot a father and son who were his social friends. The father died from his wounds, while the son survived. Id. at 527. The defendant testified that the son had shot the father, that the son had then threatened the defendant's wife, and that while the defendant was protecting his wife another acquaintance struggled with the son over the gun, resulting in the son's shooting. Id. at 534. Given this testimony, we concluded that it was not

243-244 (2010), vacated on another grounds, 567 U.S. 948 (2012), S.C., 464 Mass. 580, cert. denied, 571 U.S. 865 (2013).

improper for the prosecutor to question the defendant about his failure to contact the police after the shootings, because "if the defendant's story were true, he naturally would have contacted the police to get help for his wounded friend," the father. Id. at 536. "The prosecutor did not ask any questions about the defendant's failure to inculpate [the son] (and thus exculpate himself)," but "simply brought out the fact that the defendant did not come forward when it would have been natural for him to do so." Id. at 536-537.

Here, after the defendant testified that he had killed the victim in self-defense, the prosecutor repeatedly cross-examined the defendant about his failure to contact the police during the period between the victim's death on November 5, 2011, and his arrest on November 9, 2011.[8]  As in the cases cited above, the

---

[8] For example, at one point the prosecutor engaged in the following colloquy with the defendant:

Q.: "And it never occurred to you during any of this that you might want to call the police?"

A.: "Yes, it did. I wanted to call the police, yes."

Q.: "You wanted to call the police?"

A.: "Yes."

Q.: "Okay. Did you call the police on November 5th, 2011?"

A.: "No."

Q.: "The 6th?"

prosecutor's cross-examination and closing argument were improper insofar as they focused on the defendant's prearrest silence. Notwithstanding the defendant's statement that he "wanted to call the police," the record suggests that, even assuming that he had killed the victim in self-defense, it would not have been natural for him to contact the police or volunteer information to them under the circumstances. In addition to the fact that telling his story to the police would have implicated him in the victim's death, the defendant had other reasons for avoiding the police: he was a drug addict; he had taken the victim's money and his vehicle; and he had been previously arrested for violating a restraining order that his ex-wife had obtained, and he knew that he had violated that order again by being in the Churchill Street house.

---

A.: "No."

Q.: "The 7th?"

A.: "No, I did not."

Q.: "The 8th?"

A.: "No."

The prosecutor returned to this line of questioning three more times during cross-examination of the defendant, asking the defendant to "tell the jury when it crossed [his] mind to call the police after this happened," and whether he was thinking about calling the police while he was hiding the defendant's body, while he sent a text message to his ex-wife, or while he was trying to sell drugs to another friend.

We reject the Commonwealth's argument that it was appropriate for the prosecutor to question the defendant about his prearrest silence because he dissembled in his postarrest statement.  Our decisions have carefully distinguished impermissible references to a defendant's prearrest silence from permissible references to a defendant's postarrest statements.[9] Even where we have concluded that the prosecutor properly referred to inconsistencies and omissions in a defendant's postarrest statement, we have still held that references to a defendant's prearrest silence were improper.  See Commonwealth v. Thompson, 431 Mass. 108, 116-118, cert. denied, 531 U.S. 864 (2000) (prosecutor could properly comment on defendant's failure, during his postarrest interrogation, to ask appropriate questions about what had happened to his wife and daughter, but that it was error for prosecutor to question officer about defendant's prearrest silence when told of his wife's death).

---

[9] In a line of cases beginning with Doyle, 426 U.S. at 618, the United States Supreme Court defined the category of infractions involving the use of a defendant's silence that gives rise to constitutional error.  In Doyle, the Court held that the "use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause of the Fourteenth Amendment."  Id. at 619.  The Court in Doyle did not, however, establish a prophylactic rule that gives rise to a constitutional error in every case in which a prosecutor refers to a defendant's postarrest silence.  The rule announced in Doyle does not apply to impeachment testimony regarding prior inconsistent statements after Miranda warnings.  See Anderson v. Charles, 447 U.S. 404, 408 (1980) (per curiam).

Cf. Commonwealth v. Beneche, 458 Mass. 61, 71-72 & n.13, 76 (2010) (prosecutor could elicit testimony concerning defendant's failure to ask how his son was killed to show consciousness of guilt, but testimony about prearrest silence were not proper). The fact that the defendant ultimately chose to speak to the police after his arrest, but did so falsely, does not change our conclusion that his prearrest silence was of minimal probative value.

Because defense counsel did not object to the prosecutor's references to the defendant's prearrest silence during the defendant's cross-examination and closing argument, we determine whether those errors resulted in a substantial likelihood of a miscarriage of justice. See Commonwealth v. Kolenovic, 478 Mass. 189, 201 (2017). We conclude that they did not, because the defendant's testimony and self-defense claim were extensively and primarily undermined by other evidence at trial.

First, the jury saw the videotape recording of the defendant's interrogation following his arrest in Connecticut, during which the defendant said nothing about his alleged fight with the victim, the victim's death, or killing in self-defense. Instead, the defendant spun an elaborate tale about traveling south with the victim and having left him behind at the rest stop restaurant when he fled from the police. At trial, the defendant admitted that the story he had told during this

interrogation was a lie.  As described above, the prosecutor permissibly cross-examined the defendant about the falsehood of his story and the inconsistencies between it and the defendant's testimony at trial, and emphasized this topic in closing argument.[10]

Second, certain forensic evidence contradicted the defendant's testimony.  Although the defendant testified that he

---

[10] The prosecutor's cross-examination and comments in closing argument concerning the defendant's postarrest statements to police were proper, in contrast with the references to the defendant's prearrest silence.  The defendant certainly had the right to refuse to speak to the police following his arrest, as he was informed at the outset of his interrogation.  See, e.g., Commonwealth v. Clarke, 461 Mass. 336, 341, 345 (2012).  Having chosen to speak, the defendant's omissions in his postarrest statements to the police and the inconsistencies between those statements and his testimony at trial could be properly used by the prosecutor to question his credibility.  "A defendant who takes the witness stand . . . is subject to the ordinary rigors of proper cross-examination, including questioning about prior inconsistent statements voluntarily made."  Commonwealth v. Rivera, 425 Mass. 633, 639 (1997).  See, e.g., Commonwealth v. Morales, 440 Mass. 536, 551-552 (2003) (prosecutor could properly comment on defendant's failure to indicate he acted in self-defense in statement given to police); Commonwealth v. Thompson, 431 Mass. 108, 118, cert. denied, 531 U.S. 864 (2000) (where defendant charged with murdering wife gave voluntary postarrest statement to police during which he maintained innocence but failed to ask any questions about what had happened to wife or condition of daughter, prosecutor could properly comment on defendant's failure to ask appropriate questions that innocent party would ordinarily ask); Commonwealth v. Lavalley, 410 Mass. 641, 648-650 (1991), overruled on another ground by Commonwealth v. King, 445 Mass. 217 (2005) (where defendant in rape case testified at trial that victim had made sexual advances to him, but omitted that information in first statement to police, trial judge properly instructed jury that if they found that defendant had made false statements to police they could consider statements as evidence of consciousness of guilt).

and the victim were on the floor near some shelves when he struck most of the hammer blows, the forensic chemist saw no visible blood in that area but found visible blood on a ceiling fan and a wall clock. Most of the blood on the kitchen floor was in a different area from where the defendant alleged that he had fought with the victim and struck him with the hammer. The medical examiner stated that the scrapes on the victim's hands were "very small," "lacking any contusion around them," and that there were no injuries to the victim's forearms; this is contrary to what one might expect if the victim had engaged in a protracted struggle with the defendant.[11] And two witnesses who saw the defendant later on Saturday, November 5, testified that the defendant's demeanor was normal and that they did not notice that he had any injuries. See Commonwealth v. Waite, 422 Mass. 792, 802 (1996).

Finally, the jury heard extensive evidence tending to show the defendant's consciousness of guilt, including his efforts to conceal the victim's body and the evidence of the crime; the admittedly false text message sent to the victim's cellular telephone making it appear as if the victim had not come to the Churchill Street house on the morning of November 5; the

---

[11] The medical examiner testified that it was possible the abrasions on the victim's right hand were caused by punching the defendant, but that it was very unlikely given the absence of any bruising.

defendant's departure from New Bedford; and, after being discovered in Connecticut, his flight, efforts to hide, and false statements to police. See Commonwealth v. Cassidy, 470 Mass. 201, 217 (2014) ("[e]vidence of flight, concealment, false statements to police, destruction or concealment of evidence, . . . or similar conduct generally is admissible as some evidence of consciousness of guilt"); Barnoski, 418 Mass. at 537 n.8 (defendant's consciousness of guilt supported by "ample evidence, other than the defendant's failure to go to police, of the defendant's flight and concealment to justify this instruction").

Given all of this other evidence, we conclude that the prosecutor's improper references to the defendant's prearrest silence would have played little if any role in the jury's decision to reject the defendant's version of events. Accordingly, we conclude there was no substantial likelihood of a miscarriage of justice.

2. Prosecutor's statement in closing argument. During closing argument, the prosecutor made the following statement:

> "We now know that the defendant had a flurry of blows on [the victim's] head, that he was not unconscious for a period of time. And according to the defendant, he was the one who knocked him out. He was down on the ground. He was unconscious. That was the defendant's opportunity to flee there. That was his time to leave. All he had to do was walk out the door of the house. He didn't do that. He chose to stay, and he chose to strike [the victim] again and again

and again in the head with that hammer.  And so [the victim] breathes his last breath on the kitchen floor . . . ."

Defense counsel did not object to this statement at trial.  The defendant argues on appeal that the prosecutor mischaracterized the evidence, and thereby caused a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Mello, 420 Mass. 375, 379-380 (1995).

We disagree.  There was ample evidence to support the prosecutor's statement that the defendant struck the victim with the hammer again and again, and the defendant admitted as much.  The medical examiner testified that the victim had suffered a total of nineteen lacerations to his scalp and that the victim's injuries could have been caused by the hammer identified as the murder weapon.  Further, given the defendant's admission that one of the hammer blows he struck rendered the victim unconscious, the medical examiner's testimony that any of the lacerations and fractures she found on the victim's head could have been sufficient to do that, and her testimony that the victim only had minor scrapes on his hands and no injuries on his forearms where defensive wounds would be expected, it was certainly open to the prosecutor to suggest that some of the hammer blows were struck after the victim had lost consciousness.  See Commonwealth v. Roy, 464 Mass. 818, 829 (2013) ("In closing argument, '[p]rosecutors are entitled to

marshal the evidence and suggest inferences that the jury may draw from it.' . . . Those inferences need only be reasonable and possible" [citation omitted]).

The defendant's argument that the prosecutor mischaracterized the evidence is based on the contention that the prosecutor was recounting the defendant's testimony about the altercation with the victim.  This is not a fair interpretation of the prosecutor's statement, where he cited only the defendant's admission that he had knocked the victim out, leaving him on the ground and unconscious.  The prosecutor was not reciting the defendant's entire story about the fight, nor was he required to do so.  Citing the defendant's admission that he had knocked out the victim did not require the prosecutor to accept the defendant's other testimony that he did not strike the victim again while the victim was unconscious. The prosecutor was free to argue to the jury that they could rely on some of the defendant's admissions without being bound by all of his testimony.  See Commonwealth v. McInerney, 373 Mass. 136, 142-143 (1977) (jury may accept defendant's admissions as true while still rejecting his accompanying exculpatory statements as untrue).

3.  Jury instructions on lesser included offenses.  As a general rule, "a defendant is entitled to an instruction on a lesser included offense of the charged crime, when the facts

could support the lesser offense."  Commonwealth v. Shelley, 477 Mass. 642, 643 (2017).  Instructing the jury on the lesser included offense "gives the jury a third option, beyond acquittal or conviction" on the charged offense, and thus "mitigates concern that a jury would return a guilty verdict for the greater crime, even if they believe the prosecution has not proved each element, because the jury believe that the defendant's conduct warrants some form of punishment."  Id. at 644.

The defendant contends that the judge's instructions on the lesser included offenses to murder in the first degree were defective because they supposedly failed to make it clear that murder in the second degree and voluntary manslaughter are lesser included offenses of murder in the first degree committed with deliberate premeditation.  The defendant's argument is premised on two statements in the judge's instructions.  First, in the course of instructing the jury on murder in the second degree, the judge said:  "The requirements of proof for murder in the second degree are the same as for murder in the first degree with extreme atrocity or cruelty but without the element that the killing was committed with extreme atrocity or cruelty."  The judge repeated this statement the next day in the course of reinstructing the jury in response to their request for "a definition of the various charges and conditions."

Second, while reinstructing the jury, the judge also said: "If you look at those elements [of manslaughter] and compare it, say, to the elements of second-degree murder, you'll find that they are the identical element[s], except in second-degree murder, the Commonwealth has to prove the absence of mitigating circumstances." Because the first statement compared the elements of murder in the second degree only with the elements of murder in the first degree committed with extreme atrocity or cruelty, but not with the elements of murder in the first degree committed with deliberate premeditation, the defendant contends that these statements misled the jury into believing that murder in the second degree and voluntary manslaughter are lesser included offenses only of murder committed with extreme atrocity or cruelty, but not of murder committed with deliberate premeditation. Consequently, the defendant argues that the jury were not given the option of finding the defendant guilty of murder in the second degree or voluntary manslaughter as lesser included offenses of murder in the first degree committed with deliberate premeditation.

We conclude that there was no error in the judge's instructions. As an initial matter, both of the statements by the judge are legally correct, as the defendant concedes. The first statement is taken verbatim from the instruction on murder in the second degree contained in the Model Jury Instructions on

Homicide at 58 (2013). It properly states that the elements of murder in the second degree are the same as for murder in the first degree with extreme atrocity or cruelty, except that the former lacks the element of extreme atrocity or cruelty. See id. at 43 (instruction for murder in the first degree with extreme atrocity or cruelty). Likewise, the second statement is correct because "[a] killing that would otherwise be murder in the . . . second degree is reduced to the lesser offense of voluntary manslaughter where the Commonwealth has failed to prove that there were no mitigating circumstances." Id. at 64.

Furthermore, considered in their entirety and as a whole, the judge's instructions plainly informed the jury they could consider murder in the second degree and voluntary manslaughter as lesser included offenses of murder in the first degree with deliberate premeditation. See Commonwealth v. Bois, 476 Mass. 15, 26 (2016), quoting Commonwealth v. Young, 461 Mass. 198, 207 (2012) ("When reviewing jury instructions, '[w]e evaluate the instruction as a whole, looking for the interpretation a reasonable juror would place on the judge's words.' . . . We do not consider bits and pieces of the instruction in isolation").

The verdict slip clearly listed "Guilty of the lesser included offense of Murder in the Second Degree" and "Guilty of the lesser included offense of Manslaughter" as options for the jury to consider, following the options of not guilty, and

guilty of murder in the first degree on each of the three theories (deliberate premeditation, extreme atrocity or cruelty, and felony-murder).[12]  Moreover, when the judge described the verdict slip to the jury at the outset of his instructions on homicide, he specifically identified murder in the second degree and manslaughter as lesser included offenses of murder in the first degree under the theories of both deliberate premeditation and extreme atrocity or cruelty.  Given this context, it was sufficiently clear to the jurors that they could consider murder in the second degree and manslaughter as lesser included alternatives to murder in the first degree with deliberate premeditation.

4.  Review under G. L. c. 278, § 33E.  We have reviewed the entire record pursuant to our obligation under G. L. c. 278, § 33E, and conclude that there are no grounds for reversing the defendant's convictions or for granting any other relief.

---

[12] Insofar as the judge's instruction and the verdict slip suggested that "traditional" murder in the second degree was a lesser included offense of felony-murder in the first degree, the defendant received an instruction beyond what he was entitled to receive, because at the time of trial murder in the second degree based on malice was not a lesser included offense of felony-murder in the first degree.  See Commonwealth v. Bell, 460 Mass. 294, 307 n.19 (2011) (distinguishing between "'traditional' murder in the second degree based on malice, and felony-murder in the second degree based on a felony not punishable by life imprisonment").  But see Commonwealth v. Brown, 477 Mass. 805, 807 (2017) (in trials commencing after date of opinion, defendant may not be convicted of felony-murder without proof of one of the three prongs of malice).

<u>Judgments affirmed</u>.